STATE of Missouri, Plaintiff-Respondent,

v.

John A. SMITH, Defendant-Appellant.

No. 9231.

Missouri Court of Appeals, Springfield District.

Sept. 27, 1972.

---

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

A. L. Shortridge, Joplin, for defendant-appellant.

TITUS, Chief Judge.

A jury found defendant guilty of mistreating three-year-old Sandy as charged under § 559.340,[1] but failed to agree upon the punishment to be inflicted. Therefore, the Circuit Court of Jasper County assessed and declared defendant's punishment to be six months in the county jail and rendered judgment accordingly. Rule 27.03. Defendant appealed claiming the trial court erred in denying his motions for judgment of acquittal[2] (Rule 26.10) and in giving Instruction 3 (directing a verdict) because there was no substantial evidence that he had the care and control of the child. He also claims the court committed error by admitting into evidence over his objections color photographs of the girl which pictured the results of the alleged beating and in refusing his converse charge, Instruction 10.

Inter alia, § 559.340 states: "If any mother or father of any infant child under the age of sixteen years, . . . or any other person having the care and control of any such infant, shall unlawfully and purposely assault, beat, wound or injure such infant, whereby its life shall be endangered or its person or health shall have been or shall be likely to be injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by fine not exceeding one thousand dollars or by both such fine and imprisonment."

Defendant was not the father of the alleged mistreated child, and if it could be assumed (which it cannot) that defendant was "any other person having the care and control" of Sandy, we conclude there was substantial evidence, if viewed in the light most favorable to the State (State v. Wing, Mo., 455 S.W.2d 457, 465(17), cert. denied 400 U.S. 1009, 91 S.Ct. 566, 27 L. Ed.2d 621), from which the jury could have found that defendant beat and injured her in the manner prohibited by § 559.340. The statute defining the particular offense charged herein must be construed strictly against the State and liberally in favor of the defendant [State v. Chadeayne, Mo. (banc), 323 S.W.2d 680, 685(4)], and the statute should not be held to include any person other than those clearly described both within the letter and spirit of the law; if fair doubt exists whether the person charged is embraced within the prohibition, that doubt will be resolved in favor of the accused. State v. Hall, Mo.App., 351 S.W.2d 460, 463(3). Moreover, the State has the burden to adduce substantial evidence of every constituent element of the charged offense [State v. Chester, Mo.App., 445 S.W.2d 393, 396(3)], and one of the constituent elements of the offense laid against this particular defendant is that he was a "person having the care and control" of the mistreated child. State v. Osborne, Mo.App., 413 S.W.2d 571, 573(5).

Before defendant and Susan were wed in June 1970, each had participated in similar unsuccessful ceremonies. Susan's prior undertaking had produced for her one child, Sandy; defendant's previous matrimonial adventure resulted in his becoming the father of three sons and a daughter. To the new home Susan brought Sandy, then two years of age, and defendant

1. References to statutes, unless noted otherwise, and rules are to RSMo 1969, V.A.M.S., and Supreme Court Rules, V.A.M.R.

2. By presenting evidence in his own behalf, defendant waived any claim of error as to his motion for acquittal at the close of the State's case. State v. Hill, Mo., 438 S.W.2d 244, 247(5). We consider, therefore, only his motion made at the close of all the evidence.

brought his 10-year-old son, Gary. So as to accommodate a gathering of this size and anticipated additions, defendant, Susan, Sandy and Gary in October 1970 moved into a rural home which "[w]e were buying." Two months thereafter they were joined by defendant's other sons who resided with them "except on weekends [when] they [would] go down to their grandparents." A son was born to Susan and defendant on April 4, 1971, and save for a pregnancy leave lasting from mid-January to the date of the alleged offense, Susan was employed in Carthage during the eleven months the off-again on-again cohabitation endured. Sandy was consigned to a babysitter in Carthage while Susan attended her job. Defendant was also employed. Repeated objections by the State (sustained by the trial court) prevented any insight as to what Susan and defendant did with their separate earnings. Consequently, the record does not disclose the quantum of support defendant may have provided for Sandy.

While the union was yet fresh, some discussion was had concerning defendant's adoption of Sandy. However, the association soon grew tedious and tumultuous. The eleven months following the marriage witnessed Susan leaving defendant twice and contemplating divorce. Susan considered sending Sandy to her uncle in New York, or, as defendant recalled, Susan additionally thought of giving Sandy into the custody of the child's natural father or maternal grandmother. Although Susan testified that defendant protested when she wanted to send Sandy to live with a relative, she recounted that defendant was not affectionate toward Sandy and had told Susan he was not adverse to her and Sandy leaving home.

Sandy had not taken to toilet training by the time her mother married defendant and the problem concerned the defendant after the nuptials. Susan and defendant talked frequently of the matter. Defendant said he had discussed taking Sandy to a doctor but the problem had never been presented to a physician because "we just never did get together on taking her." It was also related by defendant that "we had tried several other ways" to correct the problem besides spanking Sandy—one of the ways was "after we had moved [to the country] we got a little switch, . . . just laid it up where we thought . . . she would think we was going to use it on her to correct her."

Concerning the charged mistreatment of Sandy: According to Susan she emerged from the bathroom the night of May 17, 1971, and saw defendant standing over Sandy, who was then in bed. She heard defendant ask her then three-year-old daughter why she had soiled her pants. When Sandy replied, "I don't know," Susan related that defendant jerked Sandy from her bed by the hair, took her into the bathroom, shut the door, and thereafter for "[n]ot any more than 10 minutes . . . heard him yelling and her screaming." The mother did not "ever hear anything like a blow being struck," but did hear the undersink bathroom "cabinet bang a couple of times." During this period, Susan made no effort to intercede for Sandy in any fashion. She undertook to explain her inactivity at this point by "just the fact that I didn't agree with him and spanking her made him violent and I was afraid if I said anything about it at all it would just be worse." Of Sandy's appearance when she left the bathroom, Susan said: "Her eyes were starting to swell shut and her face had bruises all over it and her ears and her shoulder [were] bruised. She was a mess." Defendant denied pulling Sandy from bed by her hair or beating her as Susan indicated he had done. Instead, he said he led the child to the bathroom by the hand, "spanked her with a houseslipper [on] the fanny . . . three or four times [and] talked to her about trying to get her to cooperate [about] wetting and messing her clothes." Upon examining Sandy the next afternoon, a physician testified he found "she had a large hematoma . . . of her right eyelid, the eyelid was

swollen out, completely swollen shut and discolored, red, and she had ecchymosis which are bruise marks, both ears and her back and forehead." In the doctor's opinion it would "take a minimum of four" blows to cause the injuries he observed.

■ Defendant maintains "that as a matter of law" the State did not prove he had "the care and control" of Sandy. One element of his attack is the assertion that the words "care and control" in § 559.340 "could only mean the *lawful* care and control." (All emphasis herein is ours). The words "lawful" and "legal" are ofttimes synonyms (State v. Heath, 221 Mo. 565, 584, 121 S.W. 149, 154; Webster's New World Dictionary of the American Language, College ed., pp. 828 and 835), so we assume that defendant is contending he could be an "other person" within the terms of § 559.340 only if it was established his care and control of Sandy was in some manner based upon or authorized by law. The ancestor of § 559.340 was § 1272 RSMo 1879, entitled "Mistreatment of apprentices," which embraced within its scope "any master or mistress of an apprentice or other person having the *legal* care and control of any infant." This law remained unchanged in form until 1909, and was said to apply to relationships other than master and apprentice provided the relationship was of an equal or inferior class, but that it did not embrace a superior class such as that of parent and child. State v. Koonse, 123 Mo.App. 655, 662, 101 S.W. 139, 141. The 1909 enactment (§ 4492) bore the title "Mistreatment of child or apprentice" and included "any mother . . ., or any father of any such infant child, . . . or any master or mistress of an apprentice, . . . or other person having the *legal* care or control of any such infant." By the Laws of 1921, p. 281, the statute was amended into its present wording. It is well to note that the 1921 law served to delete the word "legal," and a statute as amended should be construed on the theory that the General Assembly meant something by that elimination. Wigand v. State Dept. of Pub. Health and Welfare, Mo.App., 454 S.W.2d 951, 956 (11). Also, § 559.340 does not say "a person" or "other person" (as its predecessors) having the care and control of the child, but "any other person." Employment of the phrase "or any other person having the care and control," without inclusion of the word "legal," indicates the statute applies, aside from parents, to persons charged with the care and control of the child albeit the charge did not originate from tribunal decree and is not specifically authorized by or based upon law. State ex rel. Canfield v. Porterfield, 222 Mo.App. 553, 564–565, 292 S.W. 85, 90–91. Cf. State v. Henggeler, 312 Mo. 15, 278 S.W. 743, where a neglected child was committed to defendant's care by a county detention home and the court said (278 S.W. at 746): "The proof . . . is that, . . . the defendant had the care and custody [sic] of this child"; State v. Evans, Mo., 270 S.W. 684, where the mistreated child was in defendant's home for the summer under hire by the child's mother.

■ Professor Monrad G. Paulsen wrote in "The Legal Framework for Child Protection," 66 Columbia Law Review, at pp. 682–683, that "[t]he majority of states name as the potential offender a 'person having the care or custody,' or any person with 'legal control,' or 'any parent, adoptive parent or other person who has the permanent or temporary care or custody,' and thus suggest that only a parent or one standing in loco parentis to the child may be punished. In contrast, many states simply provide that 'any person' may be charged with the crime of cruelty to children." Our statute (§ 559.340) does not fit exactly any of the examples noted by Professor Paulsen. However, the meaning of the clause "or any other person having the care and control of any such infant" in § 559.340, is modified by the context and has relation to the preceding words "moth-

er or father," which indicates that "any other person" would include one standing in loco parentis to the child.

■ In another phase of defendant's argument he assumes that before he can be classed as "any other person having the care and control" of Sandy and before the trial court could properly instruct the jury on that constituent element of the offense, it behooved the State to prove he stood in loco parentis to Sandy. He argues against the existence of such a relationship by recasting much of the testimony heretofore recited. Nevertheless, even should defendant's assumption be accepted, the State was not required to conclusively prove the existence of that relationship; it was incumbent upon the State only to produce substantial evidence of the fact, i. e., " ' "evidence from which the triers of the fact reasonably could find the issue in harmony therewith." ' State v. Whitaker, Mo., 275 S.W.2d 316, 319." State v. Taylor, Mo., 445 S.W.2d 282, 284(4). It is true, as defendant asserts, that a stepparent, by virtue of that position alone, does not stand in loco parentis to a stepchild. State v. White, 116 Ohio App. 522, 189 N.E.2d 160, 164(9); Loomis v. State, 228 Cal.App.2d 820, 39 Cal.Rptr. 820, 822(2). A person in loco parentis is one who actually assumes a parental relation without the formalities of a legal adoption. Horsman v. United States, W.D.Mo., 68 F.Supp. 522, 524(5). Whether a stepparent has assumed the relationship of parent and child is a question of intention (Miller v. United States, 8 Cir., 123 F.2d 715, 717(5), rev'd and remanded on other grounds, 317 U.S. 192, 63 S.Ct. 187, 87 L.Ed. 179), and the existence vel non of such a relationship is usually a factual question to be determined on a trial of the case. Dodd v. United States, W.D. Ark., 76 F.Supp. 991, 995(2). The position a stepparent assumes for himself determines if he stands in loco parentis to the child [Dix v. Martin, 171 Mo.App. 266, 272, 157 S.W. 133, 135(2)], so if he voluntarily receives the stepchild into the family and treats it as a member thereof, he may be said to be standing in the place of the natural parent. 67 C.J.S. Parent and Child § 79, at p. 807.

■ Defendant and Susan, with their son and children of other marriages, shared a common table and all lived together under a single roof acquired for the purpose of housing them as a family. Sandy's natural father provided her with no support. Defendant, as to Sandy, assumed a concern regarding her place of abode by objecting to his wife's suggestions that the child reside elsewhere, and evidenced a personal interest in her toilet training problems usually possessed only by those standing in the place of a natural parent. There is no question but that defendant considered himself the head of the household. He most assuredly exercised the parental right of discipline over his stepdaughter. Under these circumstances and all others that may indicate to the contrary, we cannot, as a matter of law, declare that defendant did or did not stand in loco parentis to Sandy; whether such a relationship actually existed was for the jury. Lynch v. Rosenthal, Mo.App., 396 S.W.2d 272, 277(3); People v. Parris, 130 Ill.App.2d 933, 267 N.E.2d 39, 42. Consequently, it may not be held that the trial court erred in denying defendant's motion for judgment of acquittal at the close of the evidence (Rule 26.10), or that the evidence was not sufficient for the court to instruct the jury regarding the necessity of finding that defendant had the care and control of Sandy in order to find him guilty.

■ Four color photographs of Sandy's face, taken the day after the alleged assault, were admitted into evidence over defendant's objections. He does not now, at least, claim that Sandy or her injuries are not portrayed in their natural colors or that the pictures do not fairly represent what they purport to show. Instead, he asseverates "their inflammatory and prejudicial effect far outweighed any potential evidentiary or probative value."

The admission of photographs rests principally within the sound discretion of the trial court and their admission is proper when helpful to show relevant facts. State v. Crawford, Mo., 416 S.W.2d 178, 187 (11); State v. Sims, Mo., 395 S.W.2d 445, 449(5). Of course, "there is no logical reason why colored photographs should not be used in evidence, subject to the same limitations as black and white photographs" [Faught v. Washam, Mo., 329 S. W.2d 588, 599(19)], and photographs are not inadmissible simply because witnesses have orally described what the pictures illustrate or because they represent an unpleasant sight. State v. Stevens, Mo., 467 S.W.2d 10, 24(17), cert. denied 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546. Photographs are admissible to corroborate and clarify the testimony of witnesses. In the instant case, the beating received by Sandy and made vivid by the exhibits, throws light upon whether it endangered her life, person or health, one of the constituent elements of the charged offense. The photographs constituted material evidence, and the fact they may have been also inflammatory, was an unavoidable incident of a proper purpose. The trial court did not err in admitting them. State v. Perkins, Mo., 382 S.W.2d 701, 704–705(6, 7).

Instruction 3, given by the trial court, charged the jury, in part, "that if you find and believe from all the evidence in this case, beyond a reasonable doubt, that . . . the Defendant . . . had the care and control of [Sandy], . . ., and that . . . Defendant did willfully and unlawfully, feloniously and purposely assault and beat [Sandy] . . ., then you will find the Defendant guilty . . ., and unless you so find the facts to be you will acquit the Defendant." Instruction 10, offered by the defendant and refused by the trial court, reads: "The court instructs the jury that unless you find and believe from the evidence, beyond a reasonable doubt as defined by the other instructions, that the Defendant . . . had the care and control of [Sandy]

. . ., your verdict must be not guilty." The trial court did not give any other instruction which presented this issue conversely or in an affirmative manner from the defendant's point of view, and the State does not contend that refused Instruction 10 was incorrect in form.

 "[A] converse instruction is not a part of the law of the case on which the court must instruct whether requested or not. Hence, if a defendant wants a converse instruction given, he must formulate and offer a proper one." State v. Engberg, Mo., 377 S.W.2d 282, 286(11). Whether defendant had the care and control of Sandy was a disputed issue in the case. Although given Instruction 3 covered this issue in an abstract way from the State's standpoint, Instruction 10 was designed to present the matter conversely from the defendant's view. Under consistent rulings, when a defendant in a criminal case formulates and requests an instruction that correctly declares the law which is the converse of the State's principal instruction, it is the duty of the trial court to give the same. Moreover, it is reversible error to refuse such a converse instruction when the State's instruction, as here, does not clearly submit the converse of the issues upon which convictions are authorized. The practice of concluding the State's main instruction with the words "and unless you so find the facts to be you will acquit the defendant," or words to like effect, is not sufficient reason for refusing the converse instruction offered by the defendant. State v. Jewell, Mo., 473 S.W.2d 734, 740(6); State v. McWilliams, Mo., 331 S.W.2d 610, 613(6); State v. Chevlin, Mo., 284 S.W.2d 563, 567(11, 12); State v. Fraley, 342 Mo. 442, 447, 116 S.W.2d 17, 20–21; State v. Ledbetter, 332 Mo. 225, 228, 58 S.W.2d 453, 454(3). This is not to indicate, however, that a defendant is entitled to submit the converse of every essential factual issue to the State's case in separate instructions; this must be done in one instruction. State v. Murphy, Mo. (banc), 415 S.W.2d 758, 760(5). The trial

court committed reversible error by refusing Instruction 10. Therefore, it becomes necessary to reverse the judgment and remand the cause for a new trial. It is so ordered.

STONE and HOGAN, JJ., concur.