STATE of Missouri, Respondent,

v.

Ron HEALEY, Appellant.

No. 38154.

Missouri Court of Appeals,
St. Louis District,
Division Two.

Jan. 3, 1978.

Motion for Rehearing and/or Transfer Denied Feb. 14, 1978.

Shaw, Howlett & Schwartz, Allan Good-loe, Jr., Clayton, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Bruce Anderson, Asst. Attys. Gen., Jefferson City, Courtney Goodman, Pros. Atty., George R. Westfall, Asst. Pros. Atty., Clayton, for respondent.

DOWD, Judge.

A child abuse case. This is an appeal by defendant-appellant, Ronald Lee Healey from a judgment of conviction of the Circuit Court of St. Louis County wherein the defendant was sentenced upon a jury verdict to consecutive sentences of imprisonment totalling 55 years. The jury found defendant guilty of 5 counts of assault with intent to do great bodily harm with malice aforethought, § 559.180 RSMo 1969, and 7 counts of mistreatment of a child, § 559.340 RSMo 1969. The five assault counts of which he was convicted were for assault with a stick, a paddle, a belt, a chemical propellant, and the spray from a garden hose. The seven mistreatment counts of which he was convicted were for depriving the boy of clothing for two weeks, forcing him to shower only with cold water, depriving him of food for two days, inserting various substances into the boy's mouth, forcing him to lick up and ingest urine and feces, tying him to the bedposts of his bed, and depriving him of any furniture in his bedroom. Defendant appeals, raising 11 Points Relied On. We affirm.

In view of the many issues raised it is necessary to set out in some detail the facts.

In so doing, all evidence and favorable inferences tending to support the verdict are taken to be true. *State v. Harris,* 452 S.W.2d 577, 579[3] (Mo.1970); *State v. Oldham,* 546 S.W.2d 766, 770[6] (Mo.App.1977).

The jury could have found the facts to be as follows: Ron Healey began dating Mrs. Carol Miller, who had been divorced for 3 years, in the early part of 1973. He moved into her home in either April or June of 1973. Mrs. Miller's son, Danny, then aged four and ½ also lived there. Defendant lived there until his arrest on August 31, 1974.

The evidence indicates that there were no problems during the first year that defendant made his home with Mrs. Miller and Danny. There existed a "normal family relationship" among the three. Defendant played with the child and taught him how to do many things, like print in upper and lower case letters and tell time and eat with a knife and fork. When defendant first moved in, he was unemployed. He worked in the latter part of 1973 for an electrical company but was fired in June, 1974. The termination of his job seemed to mark the onset of his mistreatment of Danny Miller. All companionship between the defendant and the boy ceased. Suddenly he began to show interest in disciplining the boy, and his methods were "very harsh," in the words of the boy's mother.

The above forms the background for the series of atrocities to which the boy, then aged 5½ was subjected. Mrs. Miller was the main source of evidence, although some of her testimony was corroborated by neighbors and a doctor. Defendant bought a redwood stick to strike Danny with, until it splintered, presumably from excessive use. Then defendant suggested Mrs. Miller buy a ping-pong paddle because the stick wore out. They both spanked Danny with it, although prior to June of 1974 Mrs. Miller had never spanked Danny with sticks or paddles. Eventually even the ping-pong paddle gave way from excessive use, and then Danny's belt was employed to discipline him. Defendant showed Mrs. Miller just how to use the belt on Danny, with the buckle end in the palm of her hand. Defendant also struck Danny with his open hand and punched him in the stomach with his fist, because Danny "did not meet up with [defendant's] standards."

The mistreatment of the boy extended beyond direct physical assaults. In August of 1974, Danny was tied up, naked, to the footboard of his bed. All he wore was a belt, to which a piece of wire or rope was fastened and the rope was attached to the bedposts. Defendant removed the doorknobs from the door of Danny's room to keep Danny inside in the event that he became untied from the bedposts. All the furniture in Danny's bedroom was shoved against the wall, with only the empty bed frame remaining in the center of the room. The box springs and mattress were stood on edge against the wall so Danny could not sleep in his bed. He slept on the hardwood floor, naked, with no covers for about three to four weeks. This was to punish Danny for failing to appreciate his bed or covers. Defendant "ordered" Mrs. Miller to take all Danny's clothes and toys from the room. He even turned the mirror to the wall so Danny could not entertain himself by looking at his reflection. The closet doors were taped shut and all pictures were stripped from the wall. At this time Danny was not allowed to use the bathroom. A potty seat was kept in his bedroom for his toilet. The potty seat cracked once when defendant broke it over Danny's head while Danny was in the bathtub; thereafter a bucket was kept in Danny's bedroom for his toilet. A towel was stuffed under the door of Danny's bedroom to keep the stench of urine and feces from the rest of the house.

One day in May or June Danny was deprived of all food. Later in August of 1974, defendant suggested Danny be put on a diet of bread and water, "because Danny didn't appreciate food," since he did not eat all foods on his plate. Defendant set up an eating schedule for Danny, instructing Mrs. Miller as to how many pieces of bread to give him, how much water, and when to serve it to him. This lasted about one week. One morning Danny managed to

escape from his bedroom in spite of the rope tying him to the bed and the lack of a doorknob. He sneaked into the kitchen and made a concoction of crackers, chocolate syrup, and food coloring. Mrs. Miller discovered Danny was not in his bedroom and reported this to defendant. Then she discovered Danny in the kitchen eating, and took the food away from him. Defendant was especially angry when he learned Danny had eaten chocolate syrup, since Danny was never allowed to have it but it was reserved to defendant who was in the habit of eating chocolate sundaes in the evening. He told Danny he was going to make him give the food back. Defendant left the kitchen and returned with a clamp light, bucket and rope. The bucket was set on the rope and the light clamped overhead. Then, as Mrs. Miller testified, "he knocked Danny down and stood on his arms and ordered me to hand him different liquid things that were on the little turntable . . . like red hot sauce, white vinegar, Worcestershire sauce . . . and he proceeded to pour them down Danny's throat." He also directed Mrs. Miller to make a mustard solution with water and mustard, and made Danny drink it. The clamp light was pointed in Danny's face and defendant began interrogating him in the following fashion, "Are you sick? Do you feel well? If you feel you are going to be sick, you better use the bucket." Danny finally succumbed to the combination of the bright light, the inquisition, and the spicy seasonings that had been forced upon him and he vomited into the bucket. The punishment was reduced to a barbaristic atrocity when he was forced to lick up that part of his vomit that missed the bucket and was on the floor. His mother cleaned up what he did not lick up.

The abuse became even more grotesque. On another occasion Danny was told to lick up his feces from the floor. This happened as a result of a soapwater enema defendant had administered to him since his bread and water diet had left the boy constipated. After the enema, Danny was told to stand in the activity room and respond to questions put to him by defendant through Mrs.

Miller. While he was answering the questions, Danny had a bowel movement on the floor. Defendant told Mrs. Miller to order Danny to lick it up. She did so, and Danny obeyed.

Another torment Danny was forced to submit to was frequent cold showers. This was part of a daily routine which began with Danny carrying the potty-seat—later the bucket—into the bathroom, dumping the contents in the toilet, and placing the potty seat in a certain position in the bathtub to wash it out. Then Danny was to wash himself only in cold water. Defendant would turn off the hot water heater in the basement in preparation for Danny's showers. Sometimes these showers would be as long as an hour and at least twice defendant emptied ice cube trays in the bathtub to drop the temperature even further. On one occasion defendant and Mrs. Miller left Danny in the bathtub, went to a filling station, purchased four bags of ice, and dropped three bags of ice into the tub.

Defendant bought a chemical propellant, mace, for Mrs. Miller. He told her to spray it in Danny's face because in Mrs. Miller's words, "he wanted me to have complete control of Danny and he wanted me to use it to get his attention. So I was to take that with me each time we went into Danny's room and if Danny did not look at me or answer me, I was to spray him with mace." The mace was sprayed directly in Danny's face four or five times when he was naked and confined to his bedroom.

Danny's treatment came to the attention of authorities in the early morning of August 31, 1974. The previous evening Danny was told to clean the bucket, which contained his urine and feces. He was given elaborate orders on how it should be done, which included rinsing it out in the backyard with a garden hose. He was to be naked during the procedure.

The plan set out for Danny took him several hours because he was so thin and bruised. At four in the morning Danny was still in the process of performing his task. Then defendant noticed Danny was

limping, and he told him that he needed more exercise and made him run around the yard. As Danny ran, defendant told him he was not going fast enough, so he started to spray him with the hose. The water pressure was so great that it knocked Danny down several times. Meanwhile, Mrs. Miller was told to come outside and be a "lookout".

A next door neighbor, Mr. A. M. Horvath was awakened at 4:45 a. m. by the sound of water hitting a bucket. He walked out to his patio to investigate. He saw defendant giving instructions to Danny, who was naked and washing out the bucket with the hose. He heard defendant say, "Not like that, not like that, stupid. The bottom, wash the bottom, stupid." These remarks were repeated several times. The boy was whining and moaning. Mr. Horvath also heard defendant say to the boy "you are always fucking up; I see the more I try to help you, the more you fuck up." The neighbor observed this for about 20 minutes and then went to get his wife. The two of them went out to the patio and observed more of the same activity. Then the boy stopped washing the bucket and was told to walk and Mr. and Mrs. Horvath observed defendant spurting water on the boy. The boy was moaning the entire time. They also heard Danny say "You are cruel", and "It is cold." Then they went inside and called the Crestwood police. Mrs. Horvath corroborated her husband's testimony.

When defendant heard the sound of a car, he stopped this activity and told Mrs. Miller to see who was in the car. Then he brought Danny inside, and told Mrs. Miller to have Danny take his cold shower. By this time, police were at the house and eventually the defendant was taken into custody.

■ Defendant's first challenge is that the court erred in admitting into evidence a photograph showing a bruise on the left arm of Mrs. Miller. He gives four theories for why this was error. Only one such theory was the ground for defendant's objection at trial. That objection was that the photograph was "immaterial and irrelevant to any of the issues involved in this case." We only consider this ground since assignments of error on appeal must be based upon the same theory that the objection at trial was based. *State v. Jones,* 515 S.W.2d 504, 506[3] (Mo.1974); *State v. Sanders,* 539 S.W.2d 458, 464[7] (Mo.App. 1976).

We conclude that the photograph was properly admitted as it was both material and relevant.

■ Many of the counts for which defendant was convicted concerned acts that Mrs. Miller performed either jointly with defendant or by herself. These included the assault with the stick, paddle, belt, mace, the deprivation of clothing, food and furniture, cold water showers, forcing the child to lick his feces, and tying him to the bedposts. In particular, the evidence showed that only Mrs. Miller sprayed the child with mace, and it was she who ordered him to lick up his feces. However, we believe the evidence clearly showed that Mrs. Miller acted under the direction, control, and duress of the defendant in the perpetration of some of these crimes.[1] Consequently, the defendant is criminally liable for her actions. *State v. Favell,* 411 S.W.2d 245, 248[8] (Mo.App.1967). Accordingly, evidence was introduced which established that Mrs. Miller was the agency through which the defendant perpetrated these crimes. 22 C.J.S. Criminal Law § 84, at 247–48 (1961). Therefore, the photograph of Mrs. Miller's bruised arm was relevant and material to prove the issue of defendant's control of and domination over Mrs. Miller and that she was acting as she did under duress due to her fear.

---

1. Mrs. Miller's testimony revealed that she acquiesced in defendant's treatment out of fear. Defendant had threatened to kill her and her son and her parents. On one occasion he laid out the bullets from his gun and told her which one was for her, which one was for her son, which ones were for her mother and father. As a result, she fell totally under his domination. He was constantly giving her orders as well as Danny. On one occasion he told her to write a 500 word essay on how to discipline children.

Defendant's second point on appeal is that the trial court erred in admitting into evidence a note written by Mrs. Miller. It read: "8/12, I fail to give punishment for Dan's trouble. 8/13, I failed to support Ronnie with all-night situation." Defendant objected on the ground that the note was an extrajudicial corroboration of an unimpeached witness. We only consider this ground since this was the theory upon which the trial objection was based. *State v. Sanders,* supra, 539 S.W.2d at 464. We interpret this to be an objection that the notes were hearsay and as prior consistent statements, only admissible if the witness' credibility has been impeached. *State v. Earvin,* 539 S.W.2d 615, 616 (Mo.App.1976).

We believe the trial court erred in admitting the note because it is a prior consistent statement of an unimpeached witness.

However, not all trial error requires reversal. Rule 83.13(b). Error in the admission of evidence will not cause reversal if it is determined that the error was harmless without question. *State v. Degraffenreid,* 477 S.W.2d 57, 64[14] (Mo. banc 1972). We have determined that the error was unquestionably harmless. In fact, it seems to inure to the benefit of defendant. If anything, the notes show that Mrs. Miller was "disobeying" defendant, and thus seem to throw some doubt upon her contention that she was dominated by him and that she had no will of her own. Defendant therefore has no just cause for complaint. Rule 26.06.

Defendant's third contention is that the court erroneously admitted into evidence the testimony of Officer Art Stubenrouch concerning a conversation he had with Mrs. Miller. He objected at trial, claiming that the statements were immaterial, irrelevant and hearsay.

The challenged conversation took place at Mrs. Miller's home at about 4:30 p.m. on August 31. By this time defendant was in the custody of the police, but before he left he told Mrs. Miller not to let anyone in the house during his absence. Officer Stubenrouch, a juvenile officer, talked to Mrs. Miller through her picture window. The objection was made when the prosecutor asked the officer what he said to Mrs. Miller when he was trying to convince her to let him in the house in order to see Danny. Relevant excerpts from Officer Stubenrouch's testimony pertaining to this point are set out below.[2]

2. "Q. Do you remember what you told Carol Miller?

"A. Yes, sir.

"Q. What—

"MR. SHAW: Well, Judge, that would not be important, what he told Carol Miller. The defendant is not there. It is immaterial and irrelevant, and hearsay.

"MR. WESTFALL: I think it is extremely relevant.

"MR. SHAW: Judge, we have no way of testing the sincerity of that.

"MR. WESTFALL: The witness is on the stand.

"MR. SHAW: What he said to somebody else when the defendant was not around—

"THE COURT: I will sustain the objection and permit the Prosecutor to come up and make an offer of proof. Then, I may change my ruling."

\*   \*   \*   \*   \*   \*

The following took place outside the hearing of the jury:

"THE COURT: For what reason are you offering the testimony?

"MR. WESTFALL: To show she was under fear with Ron Healey and the reason she did not want the police to see the boy was because she was afraid. She was questioned a half day on that issue.

"THE COURT: Do I understand you are not offering the testimony to prove the statements, what he will say, the truth of what he will say from the witness stand? In other words, if you are offering his testimony to prove that, in fact, the defendant was in custody of the police at the time in question, that seems to be hearsay.

"MR. WESTFALL: No, I am offering it to show how he persuaded her to let them in. Whether it was true, I could care less. It happens to be true. I want the jury to know how he—

"MR. SHAW: That is immaterial evidence against this defendant.

"THE COURT: I believe I see the significance. You are objecting to the offer of proof?

"MR. SHAW: Yes. To the question and offer of proof.

"THE COURT: I will overrule the objection to the offer of proof. I reverse my ruling and I will permit the question to be put to the witness, what he said to Mrs. Miller through the window; simply what he had asked."

The statements were not hearsay. A current controversy in the law of evidence concerns the admissibility of statements made outside the court by a declarant who later becomes a witness. See 1974 U.Ill. L.F. 675. Under the orthodox rule, which Missouri follows, these prior statements by a witness are excluded unless inconsistent with, and used to impeach, present testimony of the witness. *State v. Granberry,* 491 S.W.2d 528, 530 (Mo. banc 1973). See 39 Mo.L.Rev. 472 (1974). The basis of this view is that such statements are hearsay. McCormick, *Handbook of the Law of Evidence,* § 39 at 74 (1954). But they are only hearsay if offered to prove the truth of the matter stated. *Mash v. Missouri Pacific Railroad Co.,* 341 S.W.2d 822, 827[4] (Mo. 1961); *Sabbath v. Marcella Cab Co.,* 536 S.W.2d 939, 941[4] (Mo.App.1976). Here the officer's statements to Mrs. Miller asking her to let him in the house and telling her that defendant was in jail and could not hurt her, were offered not to prove the truth of the matter stated, but to show that the statements had been made. The hearsay rule is inapplicable to such situations. *State v. Herington,* 520 S.W.2d 697, 700[3] (Mo.App.1975).

Under the unorthodox rule, the statements would also not be hearsay. Under this rule, extrajudicial statements by a declarant who is now in court to repeat them are not hearsay, even if offered to prove the truth of the matter asserted, since the witness is present in court to be cross-examined on the former statement. This is the minority rule. Wigmore and McCormick advocate versions of it, and variations of it are followed in a few jurisdictions.[3] See McCormick, supra, at § 39, pp. 73–82, 3A Wigmore on Evidence, § 1018 at 996 (Chadbourn rev. 1970). Judge Finch, concurring in result in *State v. Granberry,* would adopt one version of the minority view and suggests that Missouri abandon the orthodox view. 491 S.W.2d at 537. Since the officer was in court testifying to his own prior statements, and subject to cross-examination concerning them, McCor-

mick's version of the minority view would admit the statements into evidence. Under either view the statements are not hearsay. The point is without merit.

■ The fourth point on appeal is that the court erred in admitting evidence concerning the testimony of John Holman. John Holman was a fourteen year old boy who was called as witness for the State. He mowed the lawn at Mrs. Miller's home once in August of 1974. The testimony reads as follows:

"Q. Who hired you to do that?

"A. I don't know his name. He did.

"Q. Do you see him in the courtroom?

"A. No.

"Q. What did you say his name was?

"A. I didn't.

"THE COURT: What is the name?

"THE WITNESS: I don't know his name.

"THE COURT: Oh.

"Q. What did you say you thought it was, or did you?

"A. I didn't say.

"Q. Do you remember what the man looked like or would you know him again if you saw him?

"A. Probably not.

"Q. But it was at the house where Danny lived?

"A. Yeah.

"Q. Who else lived in that house that you remember?

"A. His mom, I thought.

  *       *       *       *       *       *

"Q. Did you have a conversation in that house with someone?

"A. Yes.

"Q. With who?

"A. I don't know his name.

"Q. Was it a man, boy or woman?

"A. Yeah, it was a man.

"Q. I will show you a photograph marked State's Exhibit 15, and ask you if this room looks familiar.

---

**3.** See, e. g., *Patterson v. State,* 263 Ind. 55, 324 N.E.2d 482 (1975); *Jett v. Commonwealth,* 436 S.W.2d 788 (Ky.1969); *Gelhaar v. State,* 41 Wis.2d 230, 163 N.W.2d 609 (1969).

"A. Yes, that's where we had the conversation.

"Q. Would you tell the jury what the conversation was?"

The defense attorney objected to the conversation contending that John Holman could not identify the defendant as the man with whom he conversed. This conversation was as follows:

"Q. John, would you tell the jury what the conversation was you had with that man?

"A. Why I mind my parents and what they would do to me if I didn't mind them.

"Q. Would you repeat—

"A. Why did I mind my parents and what they do to me when I don't mind them.

"Q. Did you tell him why you mind them or did you answer in any fashion?

"A. Yes.

"Q. How long were you in the house?

"A. For about an hour, and then later on that night, I was in there for about three hours.

"Q. Was this same man there both times?

"A. Yes.

"Q. Did the man ever tell you anything about any sports or hobbies of his?

"A. He was building an airplane—remote control.

"Q. All right. And did he perform any demonstrations for you while you were in there?

"A. He broke a broomstick with his hand. He put it between the chair and a table and he broke it. He said he was a judo or karate expert, I don't know.

"Q. One or the other?

"A. Yeah.

"Q. While you were there, did you see a woman in the house?

"A. Yes.

"Q. Did she talk to you at all?

"A. No.

"Q. Did the man talk to her?

"A. A little bit.

"Q. Do you recall anything he said to her?

"A. He kind of ordered her around. He told—

"Q. Do you remember what type of order?

"A. He told her to go make sure that Danny was washing himself right.

"Q. Did you see Danny in the house that day?

"A. Yes.

"Q. Where was he when you saw him?

"A. Standing right in the hall, almost, just at the end of the hall.

"Q. How was Danny dressed.

"A. He just—he didn't have any clothes on, he had a belt around his waist with a cord on it. Like a plastic clothesline cord.

"Q. On the belt?

"A. Yes.

"Q. But Danny had no clothes on?

"A. No.

"Q. Then, you say Mr. Healey said something to the woman about what?

"A. To go and make sure that he was washing himself right.

"Q. Did you hear the little boy say anything while you were in the house?

"A. He yelled out, like, 'Daddy, I think I am doing it right, would you come and see?'

"Q. Would you say that loud?

"A. 'Daddy, I think I am doing it right, would you come and see?'

\*  \*  \*  \*  \*  \*

"Q. Was there any conversation in the house that day about—

"MR. SHAW: I will object to this.

"MR. WESTFALL: I will withdraw the question.

\*  \*  \*  \*  \*  \*

"Q. Did this man you were talking to, did he ever tell you in what way he disciplined Danny?

"A. Huh? I didn't hear the question.

"Q. Did this man you were talking to ever tell you in what way he disciplined Danny?

"A.  A cold shower, he said.

"Q.  When you were back there that evening—why did you go back that evening?

"A.  To mow his back yard.

"Q.  Why couldn't you mow the back yard earlier?

"A.  Because it was wet.

"Q.  Do you know why it was wet?

"A.  He said he washed off Danny after he got sick.

"Q.  Did he say what he washed him off with?

"A.  The hose; he washed him off with the hose, hosed him down."

Even though John Holman could not identify by sight defendant as the man he spoke with, it was readily inferable that the man was defendant.  The conversation took place at the house where Danny and his mother and defendant lived, and John Holman identified a photograph of the living room as the room where he spoke with defendant.  We believe the court properly admitted Holman's testimony.  The trial was 16 months after John Holman's sole encounter with defendant.  It is of no consequence that a fourteen year old boy could not remember the face of a man he had met only one time sixteen months earlier.  Furthermore, John Holman's father testified that he picked up his son at Carol Miller's on the day his son mowed the lawn, and positively identified defendant in court as the man who was with Mrs. Miller at her house on that day.  The point is without merit.

Defendant's next point is that the trial court erred in admitting four photographs of the child into evidence.  He argues that they were so gruesome and horrible that they aroused the passions of the jury; that they were irrelevant and immaterial since they were unnecessary to identify the victim, the defendant, or how the injuries were inflicted, especially since there had been eyewitness testimony regarding the child's injuries.

The photographs in question showed the extent to which the boy suffered from malnutrition, and showed that he was severely bruised and battered.  According to the doctor who treated the boy the various colors of the bruises showed that some of them were from very recent blows and others were from blows that could have been inflicted months ago.

We believe the complaint regarding the admission of four photographs of the victim is disposed of by State v. Jackson, 499 S.W.2d 467 (Mo.1973).  Therein it is pointed out that trial judges have wide discretion in determining the admissibility of photographs.  The court states at 472:

"It has generally been held that even though a photograph may be inflammatory it is admissible if it tends to prove any material element of the State's case; this includes the issues of identity, condition and location of the body, nature or location of wounds, and the cause of death; and, generally, if the photograph corroborates the oral testimony of the state or refutes defense testimony it is admissible."

Our court has noted that photographs are superior to words as a means of description.  State v. Blair, 531 S.W.2d 755, 761[11] (Mo. App.1975).  Thus, even if everything depicted in the photograph was developed by oral testimony, the photograph is admissible because it "gives a much clearer impression of many things than does oral testimony and is consequently admissible to corroborate and clarify the testimony of the witnesses." State v. Davis, 515 S.W.2d 181, 183[4] (Mo. App.1974).

Furthermore, the photograph was necessary to establish elements of the State's case.  Defendant here contends that there is no evidence of intent to do great bodily harm, no evidence of defendant's malice, and no evidence of injury to Danny's person or health to support the mistreatment counts.  The photographs are material evidence going to these issues.  Even though they may have been inflammatory, it was an "unavoidable incident of a proper purpose." State v. Smith, 485 S.W.2d 461, 468[17] (Mo.App.1972).

Defendant next contends that the State failed to prove any assault by defendant upon Danny Miller. The indictment charged defendant with 11 counts of assault with intent to do great bodily harm with malice aforethought. These assaults on Danny Miller were charged to be assaults by a stick, a paddle, a belt, fist and feet, a burning cigarette, a chemical propellant, pulling Danny's hair, stepping on Danny's fingers, stomping on his head, spraying him with a hose and standing on his arms. The trial court sustained defendant's motion for judgment of acquittal regarding the assault charges pertaining to stepping on the victim's fingers and standing on his arms. There was sufficient evidence to submit all of the other charges to the jury. Mrs. Miller testified to all the assaults and her credibility was for the jury to determine. *State v. Atkins,* 494 S.W.2d 317, 321[11] (Mo.1973), *State v. Wade,* 535 S.W.2d 492, 495[4] (Mo.App.1976). Any contradictions are also to be resolved by the jury. *State v. Harris,* 539 S.W.2d 793, 794[2] (Mo.App. 1976).

The record shows that defendant seemed obsessed with inflicting upon Danny various cruelties and gauging his reaction. For example, certain notes written by defendant in the middle of August, 1974 were introduced by the State. On that night, according to Mrs. Miller, Danny was reprimanded and was told to stand in the kitchen indefinitely. Defendant and Mrs. Miller left Danny alone in the house. They were gone until dawn. When they returned, Danny was lying on the floor. Defendant sat beside Danny and took careful notes of how Danny would respond to various things defendant did to him. The notes say, for example, "stepped on fingers, left toes. Did not move or speak." "Dropped plate 12 inches from back of head. Shoulders jerked and eyes moved."

Defendant's contention that the State failed to prove "any assault by defendant upon Danny Miller" is without merit.

Next defendant claims that there was insufficient evidence of "malice" or "in-tent" on the part of the defendant to support the charge of assault with intent to do great bodily harm with malice aforethought. We disagree.

The requisite intent may be shown by the circumstances. *State v. Mathis,* 427 S.W.2d 450, 453[1] (Mo.1968). Severe lacerations can be considered as evidence of intent to do great bodily harm. *State v. Patterson,* 443 S.W.2d 104, 107[3] (Mo. banc 1969). Malice aforethought is distinguished from assault without malice by weighing all the facts and circumstances, including the comparative strength and positions of the parties, the presence or absence of provocation or mitigating circumstances, the weapon or means of force employed, and the injury sustained. *State v. Webb,* 518 S.W.2d 317, 321[3] (Mo.App. 1975). An examination of these factors makes it clear that defendant committed these assaults with malice aforethought. The relative strengths of the parties were grossly disproportionate, there was no provocation to justify the assaults, the instruments used, even though not ordinarily deadly weapons, were such as were likely to produce great bodily harm, *State v. Tettamble,* 394 S.W.2d 375, 380[17] (Mo.1965), especially to a small child. The injuries sustained made death "a real possibility" for Danny seven days after he entered the hospital, according to medical testimony. Danny required immediate surgery when he was admitted to the hospital. This surgery was a 3-hour operation and consisted of placing holes in the skull to release pressure. Later complications were treated by repeated spinal taps. Danny was hospitalized a total of 2½ to 3 months. The doctor testified that the blood clots inside Danny's head were caused by a trauma to the head. There was sufficient evidence of defendant's intent and malice.

Defendant next complains that the State failed to prove its charges of mistreatment of a child because the State failed to prove that defendant had care and

control of Danny Miller, as required by § 559.340.[4]

Defendant was charged with nine counts of mistreatment of a child over whom he had custody and control, for the following acts: 1) forcing a plastic container onto Danny's head, 2) depriving him of clothing for two weeks, 3) forcing him to shower with only cold water, 4) depriving him of food for two days, 5) inserting various substances into Danny's mouth, 6) forcing him to lick up and ingest urine and feces, 7) tying him to the bedposts of his bed, 8) depriving him of any furniture in his bedroom, and 9) forcing him to stand up continuously during his waking hours. The court sustained defendant's motion for judgment of acquittal for the last count. The jury found defendant not guilty of forcing a plastic container on Danny's head. The jury convicted defendant of the other seven counts and sentenced him to two years on each count.

Defendant argues that he never had care or control over Danny since he never married Mrs. Miller, adopted Danny, or otherwise took an action of assuming responsibility for Danny.

■ The transcript is replete with evidence that defendant had care and control of Danny even though he never married Mrs. Miller or adopted Danny. The requisite care and control is not restricted to legal control or control originating from a tribunal decree. *State v. Smith,* 485 S.W.2d 461, 466–67[5, 6] (Mo.App.1972). Rather, any person who stands in loco parentis or who otherwise has the care and control of a child comes under the sweep of § 559.340. A person in loco parentis is "one who actually assumes a parental relation without the formalities of a legal adoption." *State v. Smith,* supra at 467[9]. The existence of such a relationship is usually a question of fact. *State v. Smith,* supra at 467[10].

It is apparent that defendant had care and control of Danny, and we believe he also stood in loco parentis to Danny. He testified "I wished to be Danny's father. He wanted a daddy and you could see it. I no longer had my little girl. He was like my son, that is all." The fact that defendant assumed this role of a parent, voluntarily receiving the child and treating the child as a member of the family, is an important factor in determining whether defendant was standing in loco parentis to the child. *State v. Smith,* supra, at 467[11]. Also, defendant had been living with Danny and his mother for over a year before the incidents occurred. John Holman, who mowed the lawn at the house of Carol Miller, heard Danny refer to defendant as "Daddy" when he was at the house. The point is without merit.

■ Defendant complains that the instructions pertaining to mistreatment of a child are not supported by the evidence. He mainly argues that evidence does not show that the child was "injured" by his actions. He also argues that the evidence shows that Mrs. Miller was the guilty party relative to some of the mistreatment. We have previously held in this opinion that Mrs. Miller was the agency through whom defendant perpetrated the crimes. We believe the evidence clearly showed the child was injured. The resulting injuries from the mistreatment are set out in detail in a discussion of a prior point. Point is without merit.

Defendant's next point is that the indictment and evidence were so vague as to time that the defendant is unable to determine if he is being subjected to more than one prosecution for a single act and intent.

■ The rules for judging the sufficiency of an information or indictment are

4. Section 559.340 RSMo 1969 reads: "If any mother or father of any infant child under the age of sixteen years, whether such child was born in lawful wedlock or not, or any person who has adopted any such infant, or any other person having the care and control of any such infant, shall unlawfully and purposely assault, beat, wound or injure such infant, whereby its life shall be endangered or its person or health shall have been or shall be likely to be injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by fine not exceeding one thousand dollars or by both such fine and imprisonment.

that it must state essential facts constituting the offense charged and must adequately notify a defendant of the charge against him and constitute a bar to further prosecution for the same offense. *Hodges v. State,* 462 S.W.2d 786, 789[1] (Mo.1971); *State v. Bott,* 518 S.W.2d 726, 728[2] (Mo.App.1974). We feel that the indictment is sufficient in this regard. The indictment does not isolate the day and time on which each assault took place. It charges defendant with committing the assaults "during the months of June, July, and August of 1974."

Defendant relies for his point on *Ex parte Sydnor,* 222 Mo.App. 798, 10 S.W.2d 63 (1928). However, *Sydnor* was specifically overruled by *Honey v. Kaiser,* 352 Mo. 1120, 181 S.W.2d 492 (Mo. banc 1944). Also see *State v. Cook,* 463 S.W.2d 863, 865[1] (Mo.1971). Section 545.030 RSMo 1969 states that "1, No indictment or information shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be stayed, arrested or in any manner affected: . . . (5) for omitting to state the time at which the offense was committed, in any case where time is not of the essence of the offense." The point is dismissed.

Defendant also contends that the jury could not determine whether there were separate assaults or whether some of these assaults were part of a single act. "The test whether the offenses charged are one and the same has been expressed to be whether each offense necessitates proof of an essential fact or element not required by the other." *State v. Chambers,* 524 S.W.2d 826, 829[1] (Mo. banc 1975); *State v. Carter,* 535 S.W.2d 537, 538[2] (Mo.App.1976). Each of the assaults in the counts charged require proof of an element not required by another. Each of the counts were specific as to manner and method of assault and required separate proof. Count I requires proof of the use of a stick, count II requires the use of a paddle, count III requires proof of use of a belt. As said, each count required different proofs. Appellant's point has no merit.

The prosecutor's closing arguments are the subject of appellant's next point. Defense counsel objected to the characterization of defendant as having an "irrational mind", but he did not raise this in his motion for new trial. The issue is not preserved for our review. *State v. Hill,* 539 S.W.2d 521, 528–29[21] (Mo.App.1976). The defendant did not object at the trial to the use of the word "egomaniac"; so it is also not preserved for our review. *Cloud v. State,* 507 S.W.2d 667, 669 (Mo.App.1974). Neither characterization is "so offensive or of such gravity as to have impaired defendant's fundamental right to fair trial." *Cloud v. State,* supra, at 669[5]. Plain error is not present here.

Defendant also objects to the prosecutor's comment: "[I]t was a diabolical situation and he is a devil." Whether remarks of counsel are so prejudicial as to necessitate a mistrial rests largely within the trial court's discretion, *State v. Hunter,* 499 S.W.2d 787, 788[3] (Mo.1973), and the appellate court will not interfere unless there has been an abuse of discretion which prejudices defendant. *State v. Wintjen,* 500 S.W.2d 39, 42[1] (Mo.App.1973). Generally, a prosecutor should not apply personal epithets to the accused. *State v. Granberry,* 530 S.W.2d 714, 727[17] (Mo.App.1975). Although the characterization of the defendant as diabolical may have been improper, not every use of improper argument requires a mistrial. *State v. Raspberry,* 452 S.W.2d 169, 173[7] (Mo.1970), *State v. Scott,* 535 S.W.2d 281, 286[7] (Mo.App.1976). A mistrial is a drastic remedy not to be taken unless the prejudice can be removed in no other way. *State v. Raspberry,* supra, at 173[8], *State v. Westmoreland,* 541 S.W.2d 769, 772[4] (Mo.App.1976). In the context of this record the phrase objected to was not of such nature as to influence the jury's verdict. *State v. Wallace,* 504 S.W.2d 67, 72[10] (Mo.1973). The court did not manifestly err in not declaring a mistrial. *State v. Turnbull,* 403 S.W.2d 570, 573[6] (Mo. 1966).

Defendant next questions the sequestration of the jury. He contends the

jurors were not properly sequestered because they had available in their motel rooms telephones, radios, and televisions. At the hearing on the motion for new trial the court received into evidence affidavits of the jurors which attested to the fact that they were not subjected to any improper influence while sequestered. We believe the jury was properly sequestered. As stated in *State v. Bayless,* 362 Mo. 109, 123, 240 S.W.2d 114, 123[15] (1951), "The mere possibility that something prejudicial could have happened, of which there is no proof, is insufficient to require a new trial, where such possibility is rebutted by other facts and circumstances." See also *State v. O'Neal,* 436 S.W.2d 241, 246 (Mo.1968). With nothing in the record indicating that appellant was prejudiced or that the jury was subjected to any improper influences, we believe the evidence heard by the court and the affidavits received in evidence were sufficient to show that no improper influences were exerted on the jury and that appellant was not prejudiced. The point is denied.

Defendant's final point is that the trial court committed prejudicial error when it refused to submit to the jury defendant's instruction "A", conversing the issue of defendant's care and control of Danny Miller. The critical portion of the refused instruction read, "If you do not find and believe from the evidence beyond a reasonable doubt that during the months of June, July, and August of 1974, the defendant, Ronald Lee Healey, had the care and control of Danny Miller, you must find the defendant not guilty. . . ." This was to converse the court's Instructions 33–40 wherein the second finding required of the jury was "That at the time and in the county of St. Louis, State of Mo., the defendant *and another* had care and control of Danny Miller." (Emphasis added.)

 Defendant is entitled to a converse instruction, and it is error not give one if defendant so requests by tendering an accurate converse instruction. See, e. g., *State v. Fraley,* 342 Mo. 442, 116 S.W.2d 17, 20[3] (1938); *State v. Jewell,* 473 S.W.2d

734, 740[6] (Mo.1971); *State v. Sanders,* 541 S.W.2d 782, 785[5] (Mo.App.1976). However, if the instructions are improper because confusing or incorrect the trial court is fully justified in refusing them. *State v. Smith,* 515 S.W.2d 761, 762[2, 3] (Mo.App. 1974); *State v. McCoy,* 530 S.W.2d 8, 10[11] (Mo.App.1975). Here the proper converse would state "the defendant, Ronald Lee Healey, and another had the care and control of Danny Miller, . . . ." It was an essential part of the state's case to prove many acts of mistreatment which were perpetrated on the infant by using the mother as the agent. If the words "and another" were omitted, the jury would have been misled into thinking that they would have found him to be in *exclusive* control of Danny Miller. The trial court properly rejected defendant's converse.

The judgment is affirmed.

STEWART, P. J., and REINHARD, J., concur.