THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILBURN PARRIS, Defendant-Appellant.

(No. 70-35;

Fifth District—February 4, 1971.

934

Murray & Stephens, of Centralia, for appellant.

Ronald A. Niemann, State's Attorney, of Salem, for the People.

Mr. JUSTICE HUNT delivered the opinion of the court:

Wilburn Parris was indicted by the Grand Jury of Marion County, Illinois, for the crime of cruelty to children in violation of the Charities and Public Welfare Statute, Illinois Revised Statutes, 1967, Chapter 23, Sec. 2368.

He was tried by a jury and was found guilty. Probation was denied and Defendant was sentenced to 1-5 years in the State Penitentiary pursuant to statute. Defendant appeals to this court to set aside the jury verdict and the order of the trial court, or in the alternative for reduction of sentence.

Parris married Gladys Cook in March 1968. Mrs. Parris had five children at the time of the marriage, four of whom were the victims of the cruelty in this proceeding. They are Richard Cook and Michael Cook twins, then age 7, and George Wesley Cook, age 3, and Margaret A. Cook, age 6. All were residing in the home of the defendant, a carpenter, and step-father, and their natural mother, in Centralia, Illinois.

Prior to her second marriage, Gladys Parris had been on State aid, and during a slack season in construction, the Parris family again applied for relief. The record is silent as to any contribution of support or any parental visitation or supervision by the natural father, Roy Cook. The family circumstances would indicate these contributions were

nominal if any. The mother was awarded custody in the divorce decree.

The twins, Richard and Michael, were repeating the first grade at Central School. They were described by their teacher, Irene Rice, as being undisciplined and a problem in taking other children's pencils and clothing without any apparent knowledge of right and wrong. They occasionally engaged in school ground fights, often between themselves. Their teacher felt they were responding to guidance somewhat, prior to the incident in question.

The younger children were pre-school age and little is set forth of their conduct in the home prior to February 20, 1969.

On that date, defendant was ill with sinus problems and sought medical assistance. He and his wife, with the three younger children, drove to the doctor's office. They left the children in the car unattended and were gone for some time. They made an appointment for later in the day. Upon their return to the car they found that George and Margaret had gotten into defendant's tool box and found his blue carpenter chalk. They had it all over themselves. Mrs. Parris scolded them and warned them if they did this again they would get a spanking.

On the second trip to the doctor's office that day, the children were again left unattended and again got into the chalk. When defendant and his wife returned to the car, defendant told the children they would get a spanking when they got home. After they returned to the house and while Mrs. Parris cleaned up the baby, defendant caused George and Margaret to be stripped and proceeded to whip them with a piece of insulated electric "bell" wire from which the insulation had been partially removed, leaving the copper wire, with $\frac{3}{16}$ inch diameter, exposed for a distance of about 1¾ inches. The record is silent as to when the twins were similarly punished or why, although the body marks, photographed six days later, indicated a closely related time. The wire and photographs were admitted into evidence at the trial. Mrs. Parris stated she asked defendant not to whip the children, but did not otherwise intervene or call authorities or file a complaint.

The matter first came to the attention of authorities when Richard complained to his teacher that he hurt. She examined him, and later his brother, and found bloody marks, and sent them to the principal, Mr. J. W. Wheatley, who also looked at them. A police official, Charles Sanders, was notified as was the social agency case worker, Basil Sullens. The children were taken to the hospital emergency ward and examined by a Dr. Jose G. Bacallao, and their bodies photographed. The case worker called at the home where defendant admitted the whippings and his wife produced the wire whip.

The principal defense in the trial court which was preserved for re-

view was the applicability of the statute to the defendant, a step-father of the victims. Defendant, at the close of the State's case and in the post trial motion argued the defendant, as a step-father, had no "legal control" over the children, and that the evidence failed to show beyond a reasonable doubt that he had assumed the role of *in loco parenti* over the children. Defendant also tendered one instruction in support of this defense which was refused.

Also an issue on appeal is the severity of the sentence. Defendant had no criminal record, and no previous conviction of cruelty to children.

The statute under which defendant was convicted (ch. 23, par. 2368 IRS 1967), reads as follows:

"Any person who shall wilfully and unnecessarily expose to the inclemency of the weather, or shall in any other manner injure in health or limb, any child, apprentice, or other person under his legal control, shall be fined not exceeding $500, or imprisoned in the penitentiary for a term of not less than one year and not exceeding five years."

Prior to 1961 this statute appeared in the Criminal Code as Chapter 38, Sec. 147. It was first codified in 1874 and amended as to penalty in 1919. It has not been before the courts of review in Illinois prior to this time, insofar as it may apply to the step-parent-child relationship.

The phrase "legal control" has been construed elsewhere as meaning a lawful right to control. See Word and Phrases "Legal Control." In *Lewis v. Holden,* 99 A.2d 758, a "parent, guardian or person having legal control" of a minor could send him to the public school without paying tuition. Persons having "legal control" were said to include parents, foster parents and legal guardians, but to not include an uncle.

■■ A "foster parent" is defined as one who has performed the duties of a parent to the child of another by rearing the child as his own child. See *Norman's Est.* 295 N.W. 63; *Cicchino v. Biarsky,* 61 A.2d 163.

The subject is treated briefly in 67 C.J.S.2d p. 808, Parent and Child, Sec. 80(a) as follows:

"a. Custody and Control.

A step-parent has, by reason of the relation merely, no right to the custody and control of his step-children, but he may be entitled thereto if he stands in loco parentis to the children.

Chastisement of child.

A step-father who supports and maintains his step-children has the same right of reasonable chastisement to enforce his authority as the natural parent.

A step-parent standing in *loco parentis* should not inflict immoderate punishment on his step-child, and if he does so, will be held criminally responsible."

See also *Cameron v. State*, 136 So. 148, and *Nicholas v. State*, 28 Do. 2d. 422.

■■ Defendant was working as a carpenter averaging $150 to $160 per week. He lived with his wife and five step-children. Prior to her remarriage, Mrs. Parris had been on State aid, indicating little financial aid from her first husband. She went off public aid until the following December, when a slack in carpentry work again placed the family on relief. They all lived under the same roof, and ate at the same table from a common source of support. The record indicates the natural father was first advised of the whipping after the school authorities, the police and the social worker. Defendant was to all intents and purposes a foster parent within the definition above set forth. He was in a position of *in loco parentis* to the children involved. He certainly exercised the parental right of discipline over his step-children. Although Mrs. Parris asked him not to whip them with a wire, she acquiesced when he told the children in the car that they would get a spanking by him when they got home. In my opinion Defendant was head of the household and stood in the position of *in loco parentis* or foster parent to his step-children. As such he had them in his "legal control" within the meaning of the statute.

■■ A step-parent may exercise reasonable discipline over his step-children. He is held to the same standards as a natural or foster parent, a legal guardian of the person, or a school teacher. As was said in *City of Macomb v. Gould*, 104 Ill.App.2d:

"Granting that a teacher may enforce discipline by punishing with a switch or a paddle, we would regard clubbing over the head as malicious and unreasonable force, but between these two extremes where is the line to be drawn between what is reasonable and what is malicious? We conclude that under the circumstances as attested by a number of witnesses, there was presented a question of fact to be resolved by the trier of fact, who would also have to consider the credibility of the various witnesses and to decide what facts were actually proved. It is not our province to override the trier of fact in these respects based on our reading of a transcript."

■■ At the trial, defendant tendered one instruction which was refused. It was: "A step-parent has no right to the custody and control of his step-children merely by reason of the relationship." The trial court correctly refused this instruction under the facts in this case.

The second point raised on appeal is that the sentence is too severe. At the hearing in mitigation and aggravation and in the report of the probation officer, it was developed that defendant had no previous record of offense. He was 59 years old, regularly employed, and pro-

vided for his family when work was available. No previous incidents of child abuse were disclosed. Persons for whom he had worked described him as dependable and mild mannered. Neighbors spoke well of him and none ever knew him to over-discipline the children. Defendant admitted he was too severe with the children and sincerely exhibited a penitent and contrite attitude. The four children in this case have been placed in foster homes. A child has been born to defendant and his wife since the trial and is living with them.

■■ It is difficult to see any rehabilitative value in a penitentiary sentence for defendant. Illinois, by statute and Supreme Court rule, has given courts of appeal the authority to review sentences. The new Illinois Constitution adopted by vote of the people on December 15, 1970, calls for criminal codes to place emphasis upon rehabilitation and not upon retribution. The statute in question authorizes a fine up to $500, or sentence to the State penitentiary from 1 to 5 years. The trial judge passed the latter sentence. In our opinion more would have been accomplished by fine and/or probation.

The judgment of the trial court is approved as to the conviction of the defendant, but this case is remanded to the Circuit Court of Marion County for resentencing in conformity with the opinion of this court.

Judgment affirmed in part and reversed in part, and remanded.

MORAN, P. J. and EBERSPACHER, J., concur.