592 F.2d 381
 Eugene WHITE, Shirley White, Barbara McDowell, a minor by
Eugene White, her father and next friend and Ramon
White, a minor by Eugene White, his
father and next friend,
Plaintiffs-Appellants,
v.
James M. ROCHFORD, Superintendent of Police, City of
Chicago, P. J. Gleason, Frank Shannon, and R.
Walsh, individually and as Police
Officers of the City of
Chicago, Defendants-Appellees.
 No. 77-2125.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 20, 1978.
Decided Feb. 13, 1979.
 
 Joseph D. Palmisano, Rosenthal & Carnow, Chicago, Ill., for plaintiffs-appellants.
 Philip L. Bronstein, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellees.
 Before SPRECHER, Circuit Judge, KILKENNY, Senior Circuit Judge,* and TONE, Circuit Judge.
 SPRECHER, Circuit Judge.
 
 
 1
 The issue presented by this case is whether police officers may, with constitutional impunity, abandon children and leave them in health-endangering situations after having arrested their custodian and thereby deprived them of adult protection. We hold that they may not, and accordingly, we reverse the district court's dismissal of a complaint alleging such facts and remand for trial.
 
 
 2
 * This case arises from the district court's grant of a motion to dismiss the complaint. Accordingly, we must accept the allegations of the complaint as true in order to determine whether a cause of action under 42 U.S.C. § 1983 (1970) was stated. The complaint reveals that on the evening of October 24, 1976, the appellants, two minor children, as well as their cousin, another minor, were riding in an automobile driven by the appellants' uncle. While driving on the Chicago Skyway, a busy, limited-access highway, the uncle was stopped and arrested by the defendant police officers and charged with drag racing. Although the uncle pleaded with the officers to take the children to the police station or phone booth so that they could contact their parents, the defendant officers refused to provide any such aid. Instead, they left all three children in an abandoned automobile on the side of the road. Under exposure of the cold, the children finally realized that they had no alternative but to leave the car, cross eight lanes of traffic and wander on the freeway at night in search of a telephone. Upon finally reaching a telephone, the appellants called their mother. Since their mother had no car with which to search for and retrieve the children she called the Chicago Police Department, which again refused to lend any assistance. After a prolonged, but unspecified, length of time, the children were at last retrieved by a neighbor. As a result of this experience it is alleged that both children suffered mental pain and anguish and that the five-year-old child, an asthmatic, had to be hospitalized for one week.II
 
 
 3
 Thus, the issue before this court is whether the unjustified and arbitrary refusal of police officers to lend aid to children endangered by the performance of official duty violates the constitution where that refusal ultimately results in physical and emotional injury to the children. We hold that such conduct indisputably breaches the Due Process Clause.
 
 
 4
 Although it would be impossible to catalogue and to describe precisely each "liberty" interest protected by the Due Process Clause,[1] it can hardly be doubted that chief among them is the right to some degree of bodily integrity. As the Supreme Court recently stated: "Among the historic liberties so protected was a right to be free from, and to obtain judicial relief for unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1976). Accordingly the Due Process Clause is implicated where a policeman uses excessive force in the apprehension of a suspect,[2] withholds needed medical assistance from someone in his custody,[3] or even when a public school teacher inflicts corporal punishment on a student,[4] or forces him to cut his hair.[5]
 
 
 5
 Not only does the Due Process Clause restrain undue incursions on personal security, but also it restrains state activities which are fundamentally offensive to "a sense of justice" or which "shock the conscience." Rochin v. California, 342 U.S. 165, 172, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Although state actions prohibited under this Due Process analysis may involve incursions on personal physical integrity, such as the induced vomiting disapproved by the Court in Rochin, this need not always be the case. In Duncan v. Nelson, 466 F.2d 939 (7th Cir.), Cert. denied, 409 U.S. 894, 93 S.Ct. 116, 34 L.Ed.2d 152 (1972), this court held that an involuntary confession could serve as a basis of a § 1983 action against the police officers responsible even though no physical force was used in the extraction of the confession and even though the officers could not have been held liable for the period of incarceration caused by the trial court's admission of the confession and resultant conviction of the defendant. As we noted there: "Although physical violence would ordinarily make damages greater and more easily ascertainable, we see no reason in either logic or experience to require . . . physical violence as a necessary prerequisite to suit under § 1983." Id. at 945.
 
 
 6
 Under either of these interpretations of the Due Process Clause, the complaint sufficiently alleged a deprivation of rights secured by the Constitution sufficient to state a claim under § 1983. Under the first theory it is sufficient that the defendants left helpless minor children subject to inclement weather and great physical danger without any apparent justification. Certainly this would be a patently clear intrusion upon personal integrity if the defendants had discharged children they were transporting on the Chicago Skyway on a cold evening, and it seems incongruous to suggest that liability should turn on the tenuous metaphysical construct which differentiates sins of omission and commission.[6] Indeed, the only factor differentiating this clear hypothetical from the case at hand is the fact that whereas the hypothetical clearly involves intentional actions, the present case may not evidence an intent to injure the children as much as a neglect of their safety. However, even this difference would not justify differentiating the cases. It is clearly established that although officials may not be held liable for simple negligence, they may be held liable for "gross negligence" or "reckless disregard" for the safety of others.[7] In the case before us the police could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic. This indifference in the face of known dangers certainly must constitute gross negligence.[8]
 
 
 7
 Thus, as to the five-year-old plaintiff whose asthma was aggravated, his cause of action is well within that encompassed by § 1983 arising, as it does, from allegations of intentional or grossly negligent acts or failures to act leading to physical injury. Admittedly the case for the other defendant who alleges only psychological injury is somewhat closer, but we nonetheless feel that the protections of the Due Process Clause against arbitrary intrusions on personal security includes both physical and emotional well-being. This position arises directly from the recent Supreme Court opinion in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Carey involved issues of the appropriate measure of damages in a § 1983 action by high school students seeking monetary damages for their suspension from school without Due Process. The Court in discussing these issues enunciated the over-arching principle that "to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question . . . ." Id. at 258-59, 98 S.Ct. at 1050. The Court stated that even if the suspensions were justified, the plaintiffs would be entitled to damages upon proof of "mental and emotional distress," since one of the interests protected by the Due Process Clause is the individual's "feeling of just treatment" or "feeling that the government has (treated) him fairly." Id. at 261-64, 98 S.Ct. at 1051. If the Due Process Clause protects such an interest it is clear that its protection of personal security must necessarily extend to aspects of emotional well-being. Indeed, a child abandoned by policemen on a cold, dark highway must suffer more acutely from a feeling of unjust treatment than a high school student suspended from school.
 
 
 8
 Notwithstanding these considerations of the Due Process Clause's restrictions on unjustified intrusions on personal integrity, the second aspect of the Due Process Clause's protection the prohibition against state actions which "shock the conscience" or run counter to fundamental notions of fairness would also support a § 1983 cause of action here. Initially it should be pointed out that, as in Rochin, "(a)ll the . . . judges who have expressed themselves in this case have condemned the conduct in the strongest language." 342 U.S. at 174, 72 S.Ct. at 210. It seems difficult to understand how conduct so clearly deserving of universal reprobation can be said to fall outside of the protections of the Due Process Clause, a clause which "inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." Malinski v. New York, 324 U.S. 401, 416-17, 65 S.Ct. 781, 789, 89 L.Ed. 1029 (1945) (Frankfurter, J., concurring opn.). Certainly if that clause can serve as a basis of § 1983 damages for obtaining a confession by lengthy interrogation of the plaintiff after extended confinement, it should also encompass the outrageous conduct alleged in the complaint before this court.
 
 
 9
 The arguments advanced in opposition to this analysis by Judge Kilkenny's dissent, particularly its reliance on Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), are unpersuasive. The dissent forwards two reasons for not finding the Due Process Clause to be implicated by the conduct alleged in this case. First, the dissent says, it was the uncle's illegal activities that caused the children to be stranded, not any actions by the police. Notwithstanding the fact that the record before us indicates no ultimate disposition of the drag racing charge, this argument is overbroad. It could be said in every case of excessive force by arresting officers, a well-established violation of the Due Process Clause,[9] that the cause of the plaintiff's injuries was the plaintiff's misconduct, certainly a more compelling reason to avoid application of the Due Process Clause than the third party's misconduct relied on by the dissent. Second, the dissent argues, the children were in the same position as if the motor of the car had failed. Although it is not clear what force this argument is believed to have, it also seems to suffer from overbreadth, Viz., the victim of excessive force might have fallen and hit his head instead of having it beaten with a blunt object. See Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Finally, the reliance on Paul v. Davis, is misplaced. Although Paul v. Davis does stand for the proposition that not Every state-inflicted injury gives rise to a cause of action under § 1983, both that case and Screws, from which incomplete quotations are given, also affirm the undisputed principles that a cause of action is created where acts under color of law deprive an individual of a right secured by the Constitution. Paul v. Davis, 424 U.S. at 700, 96 S.Ct. 1155; Screws v. United States, 325 U.S. at 109, 65 S.Ct. 1031. Nothing in Paul 's holding that an individual's reputation is not protected by the procedural guarantees of the Due Process Clause[10] can be construed as retreating from the position that an individual's right to be free from unjustified intrusions upon physical and emotional well-being is protected by the substantive guarantees of that clause.
 
 
 10
 Plaintiffs conceded at oral argument that the judgment should be affirmed as to the first named defendant, James M. Rochford, Superintendent of Police, who is not alleged to have participated in the acts of which plaintiffs complain. Accordingly, the judgment is affirmed as to him.
 
 
 11
 As to the other defendants, the judgment is reversed, and the case is remanded for trial.
 
 
 12
 Reversed and Remanded.
 
 
 13
 TONE, Circuit Judge, concurring.
 
 
 14
 I agree in part, but not in all respects, with Judge Sprecher's reasons for reversal of the judgment as to the police officer defendants, and am therefore stating separately my reasons for concurring in that action.
 
 
 15
 It must be recognized, of course, that Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), admonished against unduly expanding § 1983.[1] The same majority that decided that case, however, declared in Ingraham v. Wright, 430 U.S. 651, 672-674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), that "a right to be free from, and to obtain judicial relief, for unjustified intrusions on personal security" was a "liberty preserved from deprivation without due process" by the due process clause of the Fourteenth Amendment. Id. at 673, 97 S.Ct. at 1413.[2]
 
 
 16
 Accordingly, I do not understand Paul v. Davis to have altered the principle that personal security is within the liberty interest protected by the due process clause. Application of that principle is typified by excessive force cases such as Williams v. Liberty, 461 F.2d 325, 327 (7th Cir. 1972). Although these cases have sometimes been rationalized as protecting specific guarantees under the Fourth Amendment, Jenkins v. Averett, 424 F.2d 1228, 1232 (4th Cir. 1970), or the Eighth Amendment, Howell v. Cataldi, 464 F.2d 272, 280-282 (3d Cir. 1972), Judge Friendly has pointed out that Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), "must stand for the proposition that, quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law." Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir. 1973). This view is confirmed by the recognition in Ingraham v. Wright that personal security is within the protected liberty interest. The right to personal security can hardly consist only of freedom from direct bodily harm and exclude what will often be more important, freedom from unnecessary and unjustifiable exposure to physical danger or to injury to health.
 
 
 17
 In the case at bar the children in the car had a federally protected right to be free from unjustified intrusions on their personal security by the police. Their personal security was under the protection of their uncle. If that protection was removed and no alternative protection was provided, they would be exposed to danger as occupants of an immobilized car on a highspeed expressway and to the cold. Arresting the uncle and thus removing their protection, and yet leaving the children exposed to these hazards, was an unjustifiable intrusion on the children's personal security.
 
 
 18
 The conduct of the police must be viewed in its entirety. Arresting the uncle had the incidental but inevitable effect of removing the children's only protection against danger. The police had a duty to the children to conduct the arrest in such a manner that the children's interest in personal security was not infringed.[3] Unnecessarily endangering the innocent parties in reckless disregard of their safety, Cf. Bonner v. Coughlin, 545 F.2d 565, 569 (7th Cir. 1976) (in banc), constituted an unjustifiable intrusion on their federally protected rights.
 
 
 19
 The argument that the person whose liberty interest is invaded must be the target of the action taken under color of state law seems to me to be answered by Bonner v. Coughlin, supra, 545 F.2d 565, in which we applied the standard of reckless disregard under § 1983. See also Jenkins v. Averett, supra, 424 F.2d at 1232. Under that standard an intent to injure the plaintiff need not be shown; reckless disregard for the plaintiff's constitutionally protected right is enough. If this is so, the specific purpose of the action taken under color of state law would seem irrelevant, so long as the officer acted in reckless disregard of the plaintiff's interest. The reckless disregard standard is satisfied by the allegations of the complaint.
 
 
 20
 For these reasons I believe the complaint states a claim under § 1983.
 
 KILKENNY, Senior Circuit Judge, dissenting:[1]
 
 21
 Although, with one exception,[2] I have no real dispute with Judge Sprecher's statement of the facts, nevertheless, I would prefer to preface my analysis with my own statement.
 
 
 22
 This is an appeal from an order of the district court dismissing the appellants' civil rights complaint against the appellees on the ground that "the acts complained of do not, in the court's opinion, rise to the level of a constitutional claim." The first count in appellants' complaint alleges a deprivation of their rights, privileges and immunities secured by the First, Fourth, Fifth and Fourteenth Amendments to the Constitution and 42 U.S.C. § 1983 of the Civil Rights Act. The 42 U.S.C. § 1985 claim mentioned in the count is not pressed on this appeal. Count Two of the complaint alleges the common law tort of false imprisonment and Count Three charges the common law tort of intentional infliction of emotional distress. Both are pendant to Count One.
 
 THE COMPLAINT
 
 23
 The complaint alleges, among other things, that on October 24, 1976, appellants Barbara McDowell and Ramon White, minors, and Cheri Bellanger, also a minor, were riding in an automobile driven by their uncle, Charles DeGeorge, on the Chicago Skyway, an eight lane, high speed, controlled access freeway. While so riding, their uncle was ordered to pull over to the parking lane by police officers, Gleason and Shannon, and was there arrested for drag racing. In performing this function, the officers left their marked vehicle with revolvers drawn and asked DeGeorge to remove himself from the automobile.
 
 
 24
 Further, the complaint alleges that DeGeorge asked the appellees to take the minor children in the automobile to a phone booth so the children could contact their parents. The officers refused this request. Instead, it is charged, they knowingly and intentionally left the three minor children, none of whom could drive, in the parked vehicle. It is claimed that the children were left stranded without heat, water, or any nourishment for about one hour. Subsequently, at night, under exposure from the cold, the minor appellants and Bellanger left the automobile in search of a telephone and made their way through the moving traffic on the Skyway, risking death, serious bodily harm, and molestation, believing that their only alternative was spending the night alone without protection in a cold automobile.
 
 
 25
 Upon reaching a telephone, it is alleged, Barbara McDowell called her mother, but was unable to supply information on her exact location. The mother, who was without an automobile, then called the Chicago Police Department for help, but help was refused. The Police Department, it is alleged, refused to lend any assistance whatsoever even to the extent of using a radio squad car which was already assigned to the vicinity.
 
 
 26
 It is charged that, as a result of these acts by the police officers, appellants Ramon White and Barbara McDowell suffered great mental pain and anguish. Ramon is a five year old boy afflicted with asthma who, allegedly, as a result of being exposed to the cold for a prolonged period, was confined for one week in a hospital, was absent from school, and at the time of the filing of the complaint was under outpatient care. This exposure forced the appellants' parents to incur substantial obligations for doctors' fees and medical treatment. All of the foregoing is charged in Count One.
 
 ISSUE
 
 27
 The issue on appeal is: Does the intentional abandonment of three (3) minors on the highly travelled Skyway by police officers acting under these circumstances give rise to grounds upon which relief may be granted under 42 U.S.C. § 1983?
 
 DISCUSSION
 
 28
 At the outset, I observe that the complaint does not challenge the validity of the officers' action in stopping, arresting and taking appellants' uncle into custody for drag racing. In the absence of such an allegation, I must assume the legality of the arrest and detention. Also, contrary to Judge Sprecher's inferences, there is no allegation in the pleadings that the officers knew that Ramon was an asthmatic. Moreover, what occurred after the phone call is immaterial to the appellants' § 1983 claim. If the claim is valid, it must be grounded upon the theory that the officers should not have left appellants and their companion in the parked vehicle at night on the extremely busy Skyway, well knowing that the children would have to risk injury crossing a busy artery of traffic in order to reach a telephone. We are cited to no Civil Rights Act authority, and we find none, which is even closely akin factually to this background.
 
 
 29
 Appellants charge appellees with violations of their civil rights in the following areas:
 
 
 30
 I. Interference with their right to travel in interstate commerce,
 
 
 31
 II. Interference with their right to liberty, and with family integrity, and
 
 
 32
 III. Interference with their right to be free from intimidation and coercion.
 
 I.
 
 33
 The charge that appellees interfered with appellants' right to travel in interstate commerce is clearly without merit. Appellants voluntarily chose to ride with their uncle who was legally arrested and detained for unlawful drag racing. The fact that the minors were left unattended in the vehicle and were forced to cross the dangerous Skyway does not bootstrap the officers' arrest and detention of DeGeorge into a violation of appellants' constitutional right to travel in interstate commerce. Surely, the fact that appellants were minors does not supply the missing link. Adults who could not drive would be in the same position as the minors and would be subject to the same risk. If there was interference with appellants' right to travel in interstate commerce, that action was supplied by their uncle in failing to obey the law. I find nothing in the Constitution nor in the reported decisions of this circuit or others which requires officers making a legal arrest of the driver of a vehicle to assume his responsibility for those who may be riding with him or voluntarily undertake to escort them to a telephone or to a safe place off the Skyway. As I view it, the appellants' rights on the Chicago Skyway were no greater than the rights of minors similarly situated on any non-access freeway in the United States.
 
 II.
 
 34
 My statements and conclusions with reference to appellants' contention I are equally applicable to appellants' claim that they were illegally detained and deprived of their liberty. It was the illegal action of their uncle in drag racing on the Skyway, rather than the actions of the officers, that left the appellants unattended in the vehicle. For that matter, the appellants were left in no worse position than they would have been if the motor of the vehicle had failed and they were forced to wait on the Skyway until they decided to seek assistance. The liberties of the appellants under the Fourteenth Amendment, or other constitutional provisions, were in no way violated by the officers.
 
 III.
 
 35
 My analysis and conclusions on appellants' contentions one and two fully answer the appellants' claim that the officers interfered with their right to be free from coercion and intimidation.
 
 
 36
 The most that can be said of the non-conclusory allegations of appellants' Count One is that appellants were passengers in an automobile driven by their uncle on the Chicago Skyway and that while so driving he was lawfully arrested for drag racing. As a consequence, he requested the officers to take them to a telephone which request was refused. They were left in the automobile and were forced to cross the dangerous Skyway to get to a telephone. As previously stated, I can find nothing in the actions of the officers which violated a Constitutional right of the appellants. They were in no worse position than would be any other person left stranded in a vehicle on a freeway and forced to cross the lanes of traffic of the freeway in order to obtain help. In any event, their predicament was caused by their uncle's reckless conduct and his responsibility for them did not shift to the appellees upon his arrest. These contentions are groundless.
 
 APPLICABLE LAW
 
 37
 My analysis of the complaint disregards arguments and inferential or legal conclusions. Shakman v. Democratic Organization of Cook County, 435 F.2d 267, 270 (CA7 1970), Cert. denied 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971); Hess v. Petrillo, 259 F.2d 735 (CA7 1958), Cert. denied 359 U.S. 954, 79 S.Ct. 743, 3 L.Ed.2d 761 (1959). To state a claim under 42 U.S.C. § 1983, appellants must allege conduct depriving them of their rights, privileges, or immunities secured by the Constitution and laws of the United States. Further, they must allege that the appellees subjected the appellants to this deprivation while acting under the color of state law. Monroe v. Pape, 365 U.S. 167, 172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).
 
 APPELLANTS' CASES
 
 38
 The authorities cited by appellants are wide of the mark. In no way do they support appellants' principal claims that they were deprived of their constitutional rights to liberty, non-interference with family affairs or freedom to travel in interstate commerce. They cite a number of cases which discuss the principles of "liberty under law" and attempt to apply those cases to the record before us. For example, appellants argue that Williams v. Fears, 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186 (1900), applies. True enough the Williams Court recognized a person's right to move from one place to another according to inclination, that this was an attribute of personal liberty and that ordinarily such a right is one secured by the Fourteenth Amendment and other provisions of the Constitution. However, in its final analysis the Court held that the General Revenue Act of the State of Georgia, which levied a specific tax on a person engaged in hiring laborers to be employed beyond the limits of the state, did not amount to an interference with the freedom of transit or in any manner violate the Constitution. 179 U.S. at 278, 21 S.Ct. 128. There is nothing in Williams to indicate that the actions of the officers in this case in any way constitutionally interfered with the liberty of appellants or with their right to travel in interstate commerce.
 
 
 39
 In the same vein, the appellants rely heavily upon the broad language of the Supreme Court in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), where the Supreme Court, in holding invalid a Nebraska statute prohibiting the teaching of modern languages, other than English, in a private or public school, said:
 
 
 40
 "While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." 262 U.S. at 399, 43 S.Ct. at 626.
 
 
 41
 Of course, we must read this language in the light of the factual background before us. Again, I find nothing in this language which would indicate that the constitutional liberty of a passenger in a vehicle on a freeway is interfered with when the driver of the automobile is lawfully stopped, arrested, removed, and taken into custody for illegal use of the freeway.
 
 
 42
 Despite the fact that appellants were not arrested, nor in any way the focal point of the officers' actions, they rely heavily on Jenkins v. Averett, 424 F.2d 1228 (CA4 1970). Jenkins, a Negro, was involved in a street fracas between whites and blacks in Asheville, North Carolina. Averett, an Asheville police officer, arrived on the scene and spotted Jenkins running with an object (tire tool) in his hand. Averett pursued Jenkins thinking the object was a gun and yelled "Halt." Jenkins stopped immediately and Averett in lowering his gun claimed he accidentally pulled the trigger, the bullet striking Jenkins in the thigh. In the § 1983 action growing out of the affair the district court held that Averett was guilty of gross or culpable negligence, but that such negligence could not serve as a basis for recovery under § 1983. The court of appeals reversed, holding that Averett's action under color of state law was an arbitrary intrusion upon Jenkins' rights of privacy and liberty and that the injuries arbitrarily inflicted by the police were constitutionally cognizable and remediable. In contrast, the police here took no positive action toward appellants, either arbitrary or otherwise. True enough, the complaint charges the officers with illegal conduct to the injury of appellants and that such conduct deprived appellants of their rights, privileges, and immunities secured by the First, Fourth, Fifth and Fourteenth Amendments. However, there is no factual charge or allegation showing in what manner any state action directly invaded the constitutional rights of the appellants as occurred in Jenkins and Meyer. Stripped of the excess verbiage, the complaint merely shows that the driver of the vehicle, the appellants' uncle, was lawfully arrested for drag racing on the Skyway and that appellants were left sitting in the automobile, parked on the Skyway. In no way does the decision in Jenkins apply to the facts before us.
 
 
 43
 I have studied Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Pritchard v. Perry, 508 F.2d 423 (CA4 1975), and other cases cited by appellants, including the district court cases of Willis v. Tillrock, 421 F.Supp. 368 (N.D.Ill.1976), and Alsager v. District Court of Polk County, Iowa, 406 F.Supp. 10 (S.D.Iowa 1975), and find them no more akin to our state of facts than those upon which we have specifically commented.
 
 
 44
 In my view, the recent case of Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), although distinguishable on the facts, is much more in point than the cases cited by appellants. In Paul, the claimant grounded his § 1983 action upon defendants' publication of a "flyer" carrying the phrase "active shoplifters" at the head of the page and claimant's name and photograph underneath. He charged that this action impermissibly deprived him of his "liberty" protected by the Fourteenth Amendment, and because the defendants were acting as officials of the city and county governments the nature of the complaint was thus changed from defamation under state law to an action for deprivation by the state of constitutional rights secured by the Fourteenth Amendment. In rejecting the claim, the Supreme Court commented that such a construction would necessarily result in nearly every legally cognizable injury, which might have been inflicted by a state official acting under "color of law," establishing a violation of the Fourteenth Amendment rights of the victim. I quote from Paul:
 
 
 45
 "Respondent, however, has pointed to no specific constitutional guarantee safeguarding the interest he asserts has been invaded. Rather, he apparently believes that the Fourteenth Amendment's Due Process Clause should Ex proprio vigore extend to him a right to be free of injury wherever the State may be characterized as the tortfeasor. But such a reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States. We have noted the 'constitutional shoals' that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law, Griffin v. Breckenridge, 403 U.S. 88, 101-102 (91 S.Ct. 1790, 1797-98, 29 L.Ed.2d 338) (1971); A fortiori, the procedural guarantees of the Due Process Clause cannot be the source for such law." 424 U.S. at 700-701, 96 S.Ct. at 1160. (Emphasis supplied.)
 
 
 46
 Here, as in Paul, the appellants point to no specific constitutional guarantee safeguarding the interests which they assert have been invaded.
 
 
 47
 As long ago as 1945, Justice Douglas in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), observed:
 
 
 48
 "Violation of local law does not necessarily mean that federal rights have been invaded. The fact that a prisoner is assaulted, injured or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the Constitution or laws of the United States." 325 U.S. at 108-09, 65 S.Ct. at 1039.
 
 
 49
 There, the Justice was commenting upon the effect of the criminal counterpart of § 1983.
 
 
 50
 Accordingly, even though the complaint charged that the officers were violating state law at the time of the arrest and detention, it would not necessarily mean that federal rights had been in any way invaded.
 
 
 51
 The majority, by implication, imagination, or otherwise paints a portrait which finds no support in the record. The cases cited do not fit our facts. These cases involve state or government agency action directed at a particular person whom the agency or officer has either taken into custody or over whom they have asserted responsibility. Nowhere does the majority face up to the distinction which I make as to the duty owed to the uncle, once arrested, and the absence of duty to the children against whom no action was taken.
 
 
 52
 Recognizing that the common law and the decisional law of the courts of the State of Illinois hold that acts of omission of an officer can serve as a basis for liability only where there is "an affirmative duty to act," Byrd v. Brishke, 466 F.2d 6 (CA7 1972) (Opinion, P. 7), and Huey v. Barloga, 277 F.Supp. 864 (DC ND Ill.1967), Judge Sprecher attempts to overcome this rule by citing Ill.Rev.Stat. ch. 23, § 2368 (1975), as imposing an affirmative duty on the officers to protect the children under these circumstances. There is no mention of a violation of this statute in the pleadings, nor is there a mention of the statute, nor its counterpart, Chicago Municipal Code, Ch. 190, § 190-1, in the briefs, with the exception of a casual reference to the Chicago Ordinance on page 3 of the reply brief. Needless to say, we should not consider matters which were not urged upon the district court. Moreover, it would stretch the imagination to the breaking point to apply the Illinois Statute, Chapter 23, § 2368 (1975) to the facts here alleged. The Illinois statute applies only to a person who has "Legal control " of "any child. . . ." It is manifest that the officers here involved had no control whatsoever over the children. For that matter, if they had attempted to exercise control, they probably would have been guilty of assault or other crimes under Illinois law.
 
 
 53
 The majority judges' discussions of the subject of "gross negligence" or "reckless disregard," again not raised or pursued by appellants, are grounded on cases where the claimants were the focal point of police action. In each of the cited cases on this point, the officer unintentionally shot a suspect. Manifestly, the officer was taking direct action against the person. The cases would be in point if the uncle was the complainant. However, neither of these cases establish a rule that officers making a legal arrest of the driver of an automobile undertake a duty to the passengers in the automobile who are in no way involved. In an effort to bootstrap his "gross negligence" theory, Judge Sprecher again recites the asthmatic condition of the five year old child (footnote 8). The pleadings before the district court made no allegation that the officers knew of this ailment. As stated Supra, allegations raised as an afterthought on appeal should not be considered by the reviewing panel.
 
 
 54
 No authority is cited by either member of the majority which would place the actions of the officers in the instant case in violation of the second aspect of the Due Process Clause's protection, i. e. that their action "shocks the conscience." This is just a wishful way of attempting to create a constitutional remedy where none exists. If I accept, which I do not, the majority's argument that the officers owed a duty to or were automatically responsible for any passenger of an automobile legally stopped, then the officers' inaction under the alleged affirmative duty might well be actionable.
 
 
 55
 Judge Sprecher downgrades the fact that the unfortunate position of the children was due to the reckless conduct of their uncle and not to the actions of the officers, pointing out that this court is unaware of whether the uncle was convicted on the violation for which he was cited. Obviously, this misplaces the appellees' emphasis on this point. The children's predicament was not proximately caused by any police action or inaction in the face of an affirmative duty to act.
 
 
 56
 In an effort to bolster its contention that the officers owed an affirmative duty to these minors, Judge Sprecher cites Gardner v. Village of Chicago Ridge, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966). In fact, Gardner supports the appellees' views, rather than the appellants. Gardner Involved a cause of action by a minor Taken into custody by police. The child alleged that police officers had failed to protect him from being beaten by four other youths in police custody. Recognizing that there was no general duty on the part of the officers to provide police protection to the general public, the court went on to say that under certain circumstances, a duty must arise to protect a particular individual. In Gardner, as in all cases cited by the majority judges, the duty is placed on the officers only when they have actively involved, or have directly undertaken action toward, a particular person. The difference in status between youths taken into police custody and those toward whom no police action was taken proved decisive in Gardner and, in substantial part, forms the basis of my disagreement with the majority.
 
 
 57
 In his enthusiasm to hold the officers liable, Judge Sprecher reaches out to the cases involving "legal control" under a parental relationship or relationship entailing a responsibility for the support or upbringing of minors such as People v. Parris, 130 Ill.App.2d 933, 267 N.E.2d 39 (1971). The court there held that a stepfather's actions toward his wife's children were encompassed within the provisions of Ill.Rev.Stat. ch. 23, § 2368 (1975), despite the fact that the stepfather had no legal right to custody of the children.
 
 
 58
 Neither the "legal control" statute, Ill.Rev.Stat. ch. 23, § 2368 (1975), nor the "care or custody" statute imposing an affirmative duty to protect children, Ill.Rev.Stat. ch. 23, § 2354 (1975), are controlling on our facts. To extend the provisions of the legislation to a stepfather, who normally has control of the home, does not justify extending the provisions of that legislation to an officer making an arrest of a third person.
 
 
 59
 Our facts are clearly distinguishable from those in the cases cited in footnote 6 of Judge Sprecher's opinion.
 
 
 60
 In order to justify his conclusions, Judge Sprecher is compelled to find some affirmative duty to care for the children. This he has failed to do. His statement of the issue reads as follows: "Thus, the issue before this court is whether the unjustified and arbitrary refusal of police officers to lend aid to children endangered by the performance of official duty violates the constitution where that refusal ultimately results in physical and emotional injury to the children." Clearly, the author poses the question and gives the answer in the same sentence. He assumes that the refusal of the officers to lend aid to the children was "unjustified and arbitrary" and that the children were "endangered by the performance of official duty." The ready answer is that the officers owed no duty to the children and that they were not in any way endangered by the performance of the officers in their official duty in making the arrest and taking the driver into custody.
 
 COMMENTS ON SPECIAL CONCURRENCE
 
 61
 The authorities cited in the special concurrence do not support the theory that the right to liberty under the Due Process Clause was offended by the actions of the appellees. Here, there was no "unjustified intrusions on (the) personal security" of the appellants by the officers in the context of the use of that language in Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). In Ingraham, the plaintiffs were junior high school pupils who charged defendants with inflicting corporal punishment upon them. There, the actions of the school officials were directed toward the plaintiffs. Here, no affirmative or other action was taken against the appellants by the police officers. Likewise, Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); Howell v. Cataldi, 464 F.2d 272 (CA2 1972); Williams v. Liberty, 461 F.2d 325 (CA7 1972); and Jenkins v. Averett, 424 F.2d 1228 (CA4 1970), were all excessive force cases in which the affirmative actions of the officers were directed against the individuals.
 
 
 62
 Even Bonner v. Coughlin, 545 F.2d 565 (CA7 1976) (In Banc ), upon which the special concurrence heavily relies, is devoid of any principle which affirmatively supports the appellants' claims. In Bonner, there was a direct nexus between the action of the prison officers in negligently failing to lock the door to appellant's cell and the resulting theft of appellant's trial transcript. Nonetheless, the court held that such failure was not a state deprivation of property without due process under the Fourteenth Amendment, nor was it an action "under color of state law" within the Civil Rights Statute. In commenting on the issue, the court referred to Gutierrez v. Department of Public Safety, 479 F.2d 701, 719-720 (CA7 1973), Cert. denied 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102, in which the plaintiff sought relief because the defendants had failed to prevent a brutal assault upon him. The Gutierrez court in denying the claim held there could be no recovery in the absence of such callous indifference that an intent to inflict unwarranted harm could be inferred. Appellants' allegations in their complaint do not give rise to such an inference of intent by the officers to inflict harm upon them.
 
 
 63
 The court in Bonner also quoted from this circuit's decision in Thomas v. Pate, 516 F.2d 889 (CA7 1975), Cert. denied 423 U.S. 877, 96 S.Ct. 149, 46 L.Ed.2d 110, which in turn interpreted the Supreme Court's opinion in Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), as follows:
 
 
 64
 "a plaintiff must prove that the defendant has acted within the sphere of his official responsibility, 'With the malicious intention to cause a deprivation of constitutional rights or other injury to the (plaintiff)' or 'With such disregard to the (plaintiff's) Clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.' " Thomas v. Pate, 516 F.2d at 891, n. 2. (Emphasis supplied.)
 
 
 65
 Here, as in Bonner, neither test is satisfied by the complaint.
 
 CONCLUSION
 
 66
 I would affirm the judgment of the lower court.
 
 
 
 *
 The Honorable John F. Kilkenny, Senior United States Circuit Judge for the Ninth Circuit Court of Appeals, is sitting by designation
 
 
 [1]
 It is important to keep in mind the breadth of the rights protected by the Due Process Clause. As the Supreme Court stated in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923):
 While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.
 Id. at 399, 43 S.Ct. at 626. Accordingly, the Due Process Clause restrains the state from forbidding instruction of children in a foreign language; Meyer v. Nebraska, 262 U.S. at 399, 43 S.Ct. 625, impeding access to a private or parochial education; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); or forcing individuals to undergo compulsory sterilization; Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1925). One common strain uniting these decisions is important to this case. Obviously, these cases evidence a particular emphasis by the Due Process Clause on the integrity of the parent-child relationship. See Alsager v. District Court, 406 F.Supp. 10 (S.D.Iowa 1975), Aff'd, 545 F.2d 1137 (8th Cir. 1976) (child custody encompassed within liberties protected by Due Process Clause). It is difficult to believe that this relationship is any less harmed by depriving children of adult care and stranding them on a freeway than by controlling school curricula.
 
 
 [2]
 See, e. g., Bellows v. Dainack, 555 F.2d 1105 (2d Cir. 1977); Stengel v. Belcher, 522 F.2d 438 (6th Cir. 1975), Cert. dismissed, 429 U.S. 118, 97 S.Ct. 514, 50 L.Ed.2d 269 (1976); Williams v. Liberty, 461 F.2d 325 (7th Cir. 1972)
 
 
 [3]
 Green v. Cauthen, 379 F.Supp. 361 (D.S.C.1974). See also Mullins v. City of River Rouge, 338 F.Supp. 26 (E.D.Mich.1972)
 
 
 [4]
 Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). It is important to understand that Ingraham's refusal to invalidate corporal punishment under the rubric of procedural due process was based only on its finding that existing state proceedings provided all the process that was due
 
 
 [5]
 Holsapple v. Woods, 500 F.2d 49 (7th Cir.), Cert. denied, 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974)
 
 
 [6]
 At least one opinion of this circuit accepts this distinction, requiring under § 1983 as does the common law of torts that acts of omission serve as a basis of liability only where there is an affirmative duty to act. Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972). We need not, however, reach the validity of the omission-commission distinction since the result is the same under either theory. In Byrd the court found police officers liable under § 1983 for failing to restrain fellow officers committing acts of brutality in their presence. The court based this liability for acts of omission on the policeman's "duty to enforce the laws and preserve the peace." Id. at 11. See also Huey v. Barloga, 277 F.Supp. 864, 872 (N.D.Ill.1967) ("Police officers are under an affirmative duty to preserve law and order, and to protect the personal safety of persons in the community")
 Illinois also recognizes a similar affirmative duty under the common law, although it is somewhat narrower than the duty developed under section 1983 by Byrd and Huey. In Gardner v. Village of Chicago Ridge, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966), the court upheld a cause of action by a minor child, alleging that police officers had failed to protect him from being beaten by four other youths in police custody. The court stated that although there is no general duty to provide police protection to the general public (unlike the duty we have suggested exists under section 1983), there may arise instances where the police owe such a duty to a particular individual. The fact which gave rise to such a duty in that case was that the police officers had asked the plaintiff to accompany them to aid in the apprehension of the four youths. This case can be read to stand for the proposition that where police actions are a cause, albeit not a direct one, of the plaintiff's endangerment, an affirmative duty to protect the plaintiff arises. See also Schuster v. City of New York, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958).
 This affirmative duty is made explicit with regard to the abandonment of children by Ill.Rev.Stat., ch. 23, § 2368 (1975), which provides:
 Any person who shall wilfully and unnecessarily expose to the inclemency of the weather, or shall in any other manner injure in health or limb, any child, apprentice or other person under his legal control shall be guilty of a Class 4 felony.
 The concept of "legal control" has been broadly construed beyond the bounds of parental relationships or other relationships entailing a responsibility for support or upbringing. In People v. Parris, 130 Ill.App.2d 933, 267 N.E.2d 39 (1971), the court held that a stepfather's actions towards his wife's children were encompassed by this section, despite the fact that the stepfather had no legal right to custody or control of the children. The court premised this holding on its finding that the stepfather was In loco parentis to the children. Presumably this holding results in bringing the teacher-pupil relationship within the statute. See Ill.Rev.Stat., ch. 122, §§ 24-24, 34-84a (1975).
 Once "legal control" has been divorced from the setting of parental or other relations involving responsibility for support and upbringing, there is no way to prevent its application to policemen who, by virtue of their actions, have come into control of minor children. Certainly the officers had sufficient control of the children in this sense to have shielded them from any liability for the technical assault and imprisonment involved in transporting the children to a safe place. See also Ill.Rev.Stat., ch. 70, § 61 (1975) ("Good Samaritan" Act).
 The same affirmative duty to protect children is imposed by a similar statute, Ill.Rev.Stat., ch. 23, § 2354 (1975), which makes it unlawful for any person "having the care or custody" of a child "to permit such child to be placed in such a situation that its life or health may be endangered." The phrase "care" is much broader than "legal control" and unquestionably extends beyond the bounds of parental or other relationships involving support and discipline obligations. See People v. Vandiver, 51 Ill.2d 525, 283 N.E.2d 681 (1971), where the Illinois Supreme Court applied this section to a stepfather without, as in Parris, any examination of the specific facts of the relationship between the defendant and the child to determine whether the defendant stood In loco parentis.
 Of course, it is not necessary to decide whether any actual liability under these Illinois statutes was created by the police actions here. Nonetheless, the policy of these statutes, when considered in context with the general obligation of the police to protect the personal safety of those in the community, clearly supports the existence of an affirmative duty by policemen to protect children who have been endangered due to the performance of official duties.
 
 
 [7]
 See, e. g., Aldridge v. Mullins, 377 F.Supp. 850 (D.Tenn.1972), Aff'd, 474 F.2d 1189 (6th Cir. 1973); Jenkins v. Averett, 424 F.2d 1228 (4th Cir. 1970). Both cases involved unintentional shootings caused by police officers firing warning shots at plaintiffs. The "reckless disregard" standard was articulated by this court in Bonner v. Coughlin, 545 F.2d 565, 569 (7th Cir. 1976)
 
 
 [8]
 Additionally the plaintiffs claimed in their brief that the officers had knowledge of the asthmatic child's medical condition. If this were alleged in an amended complaint, a case of deliberate disregard would clearly appear on the face of the complaint
 
 
 [9]
 See notes 2 and 7 Supra
 
 
 [10]
 424 U.S. at 710-11 n.5, 96 S.Ct. 1155. The majority limits its holding to procedural aspects of Due Process and expressly distinguishes issues of substantive protections
 
 
 [1]
 That opinion may be parsed as holding that the police chief's defamatory statement did not deprive the plaintiff of a liberty or property interest secured by the due process clause of the Fourteenth Amendment, because it did not (a) deprive the plaintiff of a right specifically guaranteed by the Federal Constitution, 424 U.S. at 700, 96 S.Ct. 1155, (b) alter a legally protected status in combination with inflicting an injury cognizable under state law, Id. at 708-712, 96 S.Ct. 1155, or (c) interfere in some way with the plaintiff's interest in "marriage, procreation, contraception, family relationships, and child rearing and education," in which "areas it has been held that there are limitations on the States' power to substantively regulate conduct," Id. at 713, 96 S.Ct. at 1166. In addition, the opinion contains admonitions calculated to discourage lower federal courts from enlarging these categories or creating others, Id. at 701, 96 S.Ct. 1155 and Passim. As pointed out in the text, however, Ingraham v. Wright, decided by the same majority the following term, recognizes that the liberty interest secured by the due process clause includes the security of the person
 
 
 [2]
 As Judge Sprecher notes, this proposition was a step in the Court's reasoning. The ultimate holding was on a procedural due process point, Viz., that the due process clause of the Fourteenth Amendment does not require notice and hearing prior to imposition of corporal punishment pursuant to the common-law privilege of school authorities that qualified the child's Fourteenth Amendment liberty interest. See White, J., dissenting, 430 U.S. at 689, n.5, 97 S.Ct. 1401. The adequacy of state law remedies, See Ingraham, supra, at 674-682, 97 S.Ct. 1401, is of course irrelevant in this case, for it is the unjustified interference with plaintiffs' personal security that is complained of and not the failure to provide adequate process before leaving the children on the highway. See id
 The Court in Ingraham also remarked in a footnote that the case did not "involve any state-created interest in liberty going beyond the Fourteenth Amendment's protection from bodily restraint and corporal punishment." 430 U.S. at 674 n.43, 97 S.Ct. at 1414. I read the footnote phrase "bodily restraint and corporal punishment," however, as a shorthand paraphrase of "intrusions on personal security."
 
 
 [3]
 This could have been accomplished by either merely issuing the uncle a summons, without taking him into custody, or removing the children to a place of safety. Which course to follow was within the discretion of the police
 
 
 [1]
 Except as to the affirmance of the judgment as to defendant Rochford, in which Judge Kilkenny concurs
 
 
 [2]
 Footnote 8 of the Sprecher opinion infers that we may consider the allegation, first raised by the appellants in their brief to this court, that the officers had knowledge of one appellant's asthmatic condition. This allegation was not before the district court and, therefore, cannot be considered here